ALBAIN, ADMINISTRATRIX, ET AL., APPELLEES, *v.* FLOWER HOSPITAL, APPELLANT.

[Cite as Albain *v.* Flower Hospital (1990), 50 Ohio St. 3d 251.]

(No. 88-2208—Submitted January 16, 1990—Decided April 25, 1990.)

*Leizerman, McGill & Williams* and *E. J. Leizerman,* for appellees.

*Robison, Curphey & O'Connell* and *E. Thomas Maguire,* for appellant.

*Bricker & Eckler, James J. Hughes, Jr.,* and *Jeanne M. Martoglio,* urging reversal on behalf of *amicus curiae,* Ohio Hospital Association.

HOLMES, J. This case presents us with two issues concerning the liability of a hospital for alleged negligent conduct by physicians with staff privileges and other professionals caring for patients on its premises. First, we are asked to determine whether, and under what circumstances, a hospital may be liable for the negligence of the physicians to which it has granted staff privileges (and who are frequently referred to as "staff physicians"). For the reasons discussed in Part I, we reject appellees' theory of so-called corporate negligence and hold that a hospital's liability must be determined by application of established rules of agency and tort law. In the present case, we hold that Dr. Abbo was in fact an independent contractor properly retained by appellant hospital, and, inasmuch as appellees failed to establish an ostensible agency relationship between the hospital and Dr. Abbo, the hospital may not be held vicariously liable for Dr. Abbo's alleged negligence.

Second, we are asked to determine whether a hospital may be held vicariously liable for its employees' alleged failure to keep an attending physician fully informed of a patient's condition. For the reasons discussed in Part II of this opinion, we answer such query in the affirmative. However, we also hold that the trial court correctly granted summary judgment in favor of appellant on this issue, and thus we reverse the judgment of the court of appeals.

Our review in this case is governed by the standard for granting a motion for summary judgment:

"Civ. R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 327, 4 O.O. 3d 466, 472, 364 N.E. 2d 267, 274; *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 117, 522 N.E. 2d 489, 505.

I

A

It is a fundamental maxim of law that a person cannot be held liable,

other than derivatively, for another's negligence. In an employment setting such as is before this court today, the most common form of derivative or vicarious liability is that imposed by the law of agency, through the doctrine of *respondeat superior*.

"The fundamental rule generally recognized is that the doctrine of *respondeat superior* is applicable to the relation of master and servant or of principal and agent, but not to that of employer and independent contractor * * *.

"The relation of principal and agent or master and servant is distinguished from the relation of employer and independent contractor by the following test: Did the employer retain control, or the right to control, the mode and manner of doing the work contracted for? If he did, the relation is that of principal and agent or master and servant. If he did not but is interested merely in the ultimate result to be accomplished, the relation is that of employer and independent contractor." *Miller* v. *Metropolitan Life Ins. Co.* (1938), 134 Ohio St. 289, 291-292, 16 N.E. 2d 447, 448, quoted in *Councell* v. *Douglas* (1955), 163 Ohio St. 292, 295, 56 O.O. 262, 263, 126 N.E. 2d 597, 599.

The law of agency thus holds a principal or employer vicariously liable for the negligence of his agents or employees committed while acting within the scope of their employment. Restatement of the Law 2d, Agency (1958) 481, Section 219(1). Employers are not vicariously liable for the negligence of independent contractors retained by them, over whom the employer has not retained the right to control the mode and manner of doing the contracted work, except in a few circumstances to be discussed below. See *Councell, supra*; Restatement of the Law 2d, Torts (1965) 370, Section 409.

In *Avellone* v. *St. John's Hospital* (1956), 165 Ohio St. 467, 60 O.O. 121, 135 N.E. 2d 410; and *Klema* v. *St. Elizabeth's Hospital of Youngstown* (1960), 170 Ohio St. 519, 11 O.O. 2d 326, 166 N.E. 2d 765, this court abrogated the concept of charitable immunity for nonprofit hospitals, and Ohio law now holds such hospitals liable for the negligent acts of their employees, under the doctrine of *respondeat superior*, "irrespective of whether those acts are administrative or medical." *Klema, supra,* at paragraph two of the syllabus.[4] Both cases, however, dealt solely with a hospital's liability for the negligence of actual agents or employees of the hospital. In both cases, this court specifically reserved the question of whether "persons working in a hospital, such as doctors and nurses, under circumstances where the hospital has no authority or right of control over them, can bind the hospital by their negligent actions." *Avellone, supra,* at 478, 60 O.O. at 478, 135 N.E. 2d at 417; *Klema, supra,* at 525-526, 11 O.O. 2d at 330, 166 N.E. 2d at 770.

In the instant case, the parties do not dispute that Dr. Abbo, a fully licensed obstetrician with a private practice and staff privileges at Flower Hospital, who billed all her patients directly (including Sharon), was an independent contractor over whom Flower Hospital "had no authority or

---

[4] In *Klema,* the court held the hospital potentially liable for the negligent acts of an anesthesiologist employed as a resident physician, whose employment status was comparable to that of Dr. Billings here.

right of control." As contrasted with a hospital's full-time salaried employees such as residents, interns and "house physicians,"[5] an independent staff physician often has staff privileges at several hospitals. While each of these hospitals has the power to grant and revoke staff privileges, and may establish policies and procedures related to patient care, accredited hospitals must allow their staff physi-cians "to provide patient care services independently within the scope of their clinical privileges." Joint Commission on Accreditation of Hospitals, Accreditation Manual for Hospitals, 1986 (1985) 101, cited in Comment, Hospital Liability for Physician Malpractice: The Impact of *Hannola* v. *City of Lakewood* (1986), 47 Ohio St. L.J. 1077, 1083.[6] The mere granting of staff privileges to an independent

---

[5] "Typically a hospital has many different categories of physicians practicing medicine. A typical hospital will usually grant private physicians 'staff privileges.' This includes the right to admit and discharge their own private patients to the hospital and the right to use the hospital's facilities. A second group includes those physicians still in training. This would include interns who are typically two years out of medical school, residents who are in their first year out of medical school, and externs, usually third and fourth year medical students who are practicing under the supervision of an experienced physician. Additionally, hospitals often employ full-time salaried physicians. This would include both the faculty of a teaching hospital that elected to educate residents, interns, and externs, and those physicians who have contracted with the hospital to provide medical services to the hospital's clientele for a stipulated fee. * * *." Classen, Hospital Liability For Independent Contractors: Where Do We Go From Here? (1987), 40 Ark. L. Rev. 469, 478, fn. 44. Physicians with staff privileges have long been considered independent contractors, as acknowledged by the Restatement of the Law 2d, Agency (1958) 496, Section 223, Comment *a*:

"The fact that the law requires an examination and a certain standard of skill does not prevent the relation of master and servant from arising: *it may, however, indicate, as in any other case in which skill is involved, that such a relation is not contemplated,* as in the case of attorneys and surgeons, whereas in other cases, as in the case of chauffeurs, the fact that some skill is required has little bearing upon the inference to be drawn. Even in the case of attorneys and physicians there may be the master and servant relation, as where a firm of attorneys employs an attorney as a member of the office staff. So likewise, *while the physician employed by a hospital to conduct operations is not, in the normal case, a servant of the hospital,* yet it may be found that the house physician or the internes [*sic*], if subject to directions as to the manner in which their work is performed, are servants of the hospital while in performance of their ordinary duties." (Emphasis added.)

[6] "Hospitals voluntarily seek accreditation for financial and professional prestige reasons. First, accreditation by the JCAH ['Joint Commission on Accreditation of Hospitals'] means the hospital qualifies to participate in the federal Medicare and Medicaid programs. Accreditation by JCAH is deemed substantial compliance with the Medicare conditions of participation. 42 U.S.C. 1395bb (1982); 42 C.F.R. 405.1901(d) (1986). *See generally,* Dornette [*The Legal Impact on Voluntary Standards in Civil Actions Against the Health Care Provider,* N.Y. L. Sch. Rev. 925 (1977)] * * * at 927, Holbrook & Dunn [*Medical Malpractice Litigation: The Discoverability and Use of Hospitals' Quality Assurance Committee Records,* 16 Washburn L.J. 54 (1976)] * * * at 58. Second, JCAH accreditation is often a prerequisite to obtaining approval of internship and residency programs. *See generally, American Medical Association Directory of Accredited Residencies* 3 (1975-76), *quoted in*

private physician, which the hospital may later revoke under its procedures, does not establish the requisite level of authority or control over such physician to justify liability under the doctrine of *respondeat superior*. We specifically reject any inclusion within the holding of the court of appeals in *Hannola* v. *Lakewood* (1980), 68 Ohio App. 2d 61, 67-69, 22 O.O. 3d 63, 66-68, 426 N.E. 2d 1187, 1191-1192, to the contrary.

We do not hold, however, that a hospital may never be held liable for the negligence of a physician with staff privileges. There are three generally recognized exceptions to the independent contractor rule, each of which has been raised in this appeal. First, an employer may be directly liable for injuries resulting from its own negligence in selecting or retaining an independent contractor. See, generally, Restatement of the Law 2d, Torts, *supra*, at 376, Section 411. Second, an employer may be held vicariously liable for the negligence of an independent contractor performing certain "nondelegable duties" which are imposed by statute, contract, franchise or charter, or by the common law. Prosser & Keeton, The Law of Torts (5 Ed. 1984) 511-512, Section 71; Restatement of the Law 2d, Torts, *supra*, at 395, Section 416 *et seq.*; Classen, Hospital Liability for Independent Contractors: Where Do We Go From Here? (1987) 469, at 475-476. Third, an employer may be held vicariously liable for the negligence of an independent contractor under the doctrine of agency by estoppel which requires a showing of induced reliance by a third person upon an ostensible

agency. *Rubbo* v. *Hughes Provision Co.* (1941), 138 Ohio St. 178, 20 O.O. 233, 34 N.E. 2d 202; *Johnson* v. *Wagner Provision Co.* (1943), 141 Ohio St. 584, 26 O.O. 161, 49 N.E. 2d 925, paragraph four of the syllabus.

### B

*Negligent Granting or Continuation of Staff Privileges to Independent Physicians*

The court of appeals below, in its second headnote, held:

"A hospital has a direct and independent responsibility to its patients to insure the competency of its medical staff and the quality of medical care provided through the prudent selection, review, and continuing evaluation of the physicians granted staff privileges."

The court reached this conclusion in answer to the query posed by the Albains, *i.e.*, whether the hospital had a duty under existing circumstances to *monitor* the actions of Dr. Abbo, the attending physician. In so doing, and holding that issues of fact exist as to whether Flower Hospital breached this duty, the court of appeals adopted an unduly broad theory of "corporate negligence" which we are not willing to accept.

It is well-established that an employer must exercise reasonable care in the selection of a competent and careful independent contractor. Restatement of the Law 2d, Torts, *supra*, at 376, Section 411. See, also, Classen, *supra*, at 474-475, and cases cited therein. In a hospital setting, this rule translates into a duty by the hospital only to grant and to continue

---

Dornette * * * at 928. Finally, the institution's reputation and standing in the community is affected by whether it receives

JCAH accreditation. *See* Holbrook & Dunn * * *." *Jackson* v. *Power* (Alaska 1987), 743 P. 2d 1376, 1383, fn. 14.

staff privileges of the hospital to competent physicians. *Taylor* v. *Flower Deaconess Home & Hosp.* (1922), 104 Ohio St. 61, 135 N.E. 287; *Penn Tanker Co.* v. *United States* (S.D. Tex. 1970), 310 F. Supp. 613; *Mitchell Cty. Hosp. Auth.* v. *Joiner* (1972), 229 Ga. 140, 189 S.E. 2d 412; *Johnson* v. *Misericordia Community Hosp.* (1981), 99 Wis. 2d 708, 301 N.W. 2d 156; *Fiorentino* v. *Wenger* (1967), 19 N.Y. 2d 407, 280 N.Y. Supp. 2d 373, 227 N.E. 2d 296. The hospital may delegate this duty to a staff physician committee, but it cannot escape its duty of due care in the process of granting and continuing staff privileges by doing so. *Johnson* v. *Misericordia Community Hosp., supra; Mitchell Cty. Hosp. Auth., supra.*

In *Johnson* v. *Misericordia Comm. Hosp., supra,* at 723, 301 N.W. 2d at 164, the Wisconsin Supreme Court set out the proper limits of the hospital's liability:

"[T]he issue of whether * * * [the hospital] should be held to a duty of care in the granting of medical staff privileges depends upon whether it is foreseeable that a hospital's failure to properly investigate and verify the accuracy of an applicant's statements dealing with his training, experience and qualifications as well as to weigh and pass judgment on the applicant would present an unreasonable risk of harm to its patients. The failure of a hospital to scrutinize the credentials of its medical staff applicants could foreseeably result in the appointment of unqualified physicians and surgeons to its staff. Thus, the granting of staff privileges to these doctors would un-

doubtedly create an unreasonable risk of harm or injury to their patients. Therefore, the failure to investigate a medical staff applicant's qualifications for the privileges requested gives rise to a foreseeable risk of unreasonable harm and * * * a hospital has a duty to exercise due care in the selection of its medical staff."

Thus, a plaintiff must demonstrate that but for the hospital's lack of care in selecting the physician, the physician would not have been granted staff privileges and the plaintiff would not have been injured. *Id.* See, also, *Ferguson* v. *Gonyaw* (1976), 64 Mich. App. 685, 236 N.W. 2d 543. Moreover, once a competent and careful physician has been granted staff privileges, the hospital will not thereafter be liable unless it had reason to know that the act of malpractice would most likely take place. That is, where a previously competent physician with staff privileges develops a pattern of incompetence, which the hospital should become aware of through its peer review process,[7] the hospital must stand ready to answer for its retention of such physician. See, generally, Williams, The Quandary of the Hospital Administrator in Dealing with the Medical Malpractice Problem (1976), 55 Neb. L. Rev. 401, 406-407.

We must stress that this independent duty of the hospital is limited to the exercise of due care in the granting of staff privileges, and the continuation of such privileges, to independent private physicians. A physician's negligence does not automatically mean that the hospital is liable, and does not raise a presumption that the hospital was negligent in granting the

---

[7] *Amicus curiae* Ohio Hospital Association states in its brief that hospitals are required by the JCAH to undertake quality assurance programs whereby the quality of medical care rendered is periodically evaluated and adjusted.

physician staff privileges. *Crumley* v. *Memorial Hospital, Inc.* (D. Tenn. 1978), 509 F. Supp. 531, citing *Mooney* v. *Stainless, Inc.* (C.A.6, 1964), 338 F. 2d 127, certiorari denied (1965), 381 U.S. 925. Nor is a hospital required to constantly supervise and second-guess the activities of its physicians, beyond the duty to remove a known incompetent. Most hospital administrators are laypersons with no medical training at all. See Note, Medical Malpractice — Ostensible Agency and Corporate Negligence (1986), 17 St. Mary's L.J. 551, 572, fn. 101. In any event, only licensed physicians, not hospitals, are permitted to practice medicine or surgery in this state. R.C. 4731.41.

"* * * [A hospital] is not required to pass upon the efficacy of treatment; it may not decide for a doctor whether an operation is necessary, or, if one be necessary, the nature thereof; but it owes to every patient whom it admits the duty of saving him from an illegal operation of false, fraudulent, or fictitious medical treatment." *Hendrickson* v. *Hodkin* (1937), 250 App. Div. 619, 621, 294 N.Y. Supp. 982, 984-985 (Lazansky, J., dissenting), reversed (1937), 276 N.Y. 252, 11 N.E. 2d 899, quoted with approval in *Fiorentino, supra,* at 415, 280 N.Y. Supp. 2d at 378, 227 N.E. 2d at 299-300. In short, the hospital is not an *insurer* of the skills of physicians to whom it has granted staff privileges.

Our holding here is not inconsistent with our decision in *Johnson* v. *Grant Hospital* (1972), 32 Ohio St. 2d 169, 61 O.O. 2d 413, 291 N.E. 2d 440, wherein we held, at syllabus: "A hospital owes a duty to its patients to exercise such reasonable care for their safety as their known mental and physical condition may require * * *." As is evident from the remainder of the syllabus language and the entire *Johnson* opinion, the rule stated

therein is one of *respondeat superior* and of the general duty to maintain reasonably safe and adequate facilities and equipment. See *Jones* v. *Hawkes Hosp. of Mt. Carmel* (1964), 175 Ohio St. 503, 26 O.O. 2d 170, 196 N.E. 2d 592; and *Burks* v. *Christ Hosp.* (1969), 19 Ohio St. 2d 128, 48 O.O. 2d 117, 249 N.E. 2d 829 — both cited in *Johnson* v. *Grant Hospital*; and Note, *supra,* 17 St. Mary's L.J. at 558-559, fn. 36. *Johnson* v. *Grant Hospital* is inapplicable to issues involving the malpractice of physicians to whom the hospital has granted staff privileges.

We are aware that a number of our sister jurisdictions have expanded the independent duty of hospitals so as to require them to totally ensure the patient's safety while at the hospital. This expansion of a hospital's duties, including a duty to oversee a physician's care of individual patients and a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patient, has progressed in varying degrees, under the moniker of "corporate negligence," towards imposing strict liability upon hospitals. See, generally, Note, *supra,* 17 St. Mary's L.J. at 558-559. We are not convinced of the wisdom of such expansive liability and, accordingly, we hold that a hospital may be held directly liable for the malpractice of an independent physician with staff privileges only to the extent discussed above.

In the case before us, Sharon Albain presented no evidence demonstrating that but for Flower Hospital's lack of care in reviewing Dr. Abbo's credentials it would not have granted staff privileges to her. Additionally, appellee presented no evidence that Dr. Abbo was not a competent obstetrician. The mere testimony by nurse Graves that Dr. Abbo had been tardy in arriving at the hospital on

several occasions is insufficient to raise a material issue as to Dr. Abbo's continued competence as an obstetrician or whether Flower Hospital had reason to know that malpractice would take place. Thus, summary judgment was properly granted in favor of the hospital on this issue.

## C

### Nondelegable Duties

"A non-delegable duty is an established exception to the rule that an employer is not liable for the negligence of an independent contractor. W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on The Law of Torts,* § 71 at 511-12 (5th ed. 1984). According to the late Professor Prosser, such a duty 'may be imposed by statute, by contract, by franchise or by charter, or by the common law.' *Id.* Among the duties considered nondelegable are the following:

"[']['][T]he duty of a carrier to transport its passengers in safety, of a railroad to fence its tracks properly or to maintain safe crossings, and of a municipality to keep its streets in repair; the duty to afford lateral support to adjoining land, to refrain from obstructing or endangering the public highway, to keep premises reasonably safe for business visitors, to provide employees with a safe place to work; the duty of a landlord to maintain common passageways, to make repairs according to covenant, or to use proper care in making them, and no doubt others.['] *Id.* (Footnotes omitted.)" *Jackson* v. *Power* (Alaska 1987), 743 P. 2d 1376, at 1383-1384.

In *Jackson,* the Supreme Court of Alaska held a hospital had a nondelegable duty to ensure the absence of negligence in the provision of emergency room services provided by physicians under contract with the hospital, based upon state regulations,

JCAH standards, and the hospital's own bylaws which provided for the establishment of an emergency room. *Jackson* is the more notable case from a very few jurisdictions which have recently begun to explore the application of this nondelegable duty exception to the hospital setting. Gwynn, Hospital Liability in Florida: The Nondelegable Duty Doctrine (Feb. 1990), Florida Bar J. 14. Appellee urges this court to adopt the *Jackson* court's reasoning where, as here, a hospital undertakes to provide staff physicians to treat patients who have no physician or whose physician has not been granted staff privileges.

This court has recognized the nondelegable duty exception to the independent contractor rule in a few of the traditional areas noted by Professor Prosser, *supra.* See, *e.g., Richman Bros. Co.* v. *Miller* (1936), 131 Ohio St. 424, 6 O.O. 119, 3 N.E. 2d 360, paragraphs one through four of the syllabus (duty to refrain from interfering with the right of the public to safe and unimpeded use of highways and streets, and the duty to keep premises reasonably safe); *Strayer* v. *Lindeman* (1981), 68 Ohio St. 2d 32, 22 O.O. 3d 159, 427 N.E. 2d 781, at syllabus (duty of a landlord to exercise reasonable care in proceeding with repairs). At least two lower courts have extended the nondelegable duty exception to a hospital providing independent physicians in the operating room, *Stratso* v. *Song* (1984), 17 Ohio App. 3d 39, 17 OBR 93, 477 N.E. 2d 1176 (anesthesiologist), and to a hospital contracting with third-party physicians to operate the hospital's emergency room facility, *Griffin* v. *Matthews* (1987), 36 Ohio App. 3d 228, 522 N.E. 2d 1100. Those decisions are inapplicable here, and we conclude that they represent misdirected attempts to circumvent the necessity of proving

agency by estoppel,[8] and confuse the proper scope of a hospital's duty in selecting competent physicians as discussed above.

Employers are held liable under the traditional nondelegable duty exception because the nature of the work contracted involves the need for some specific precaution, such as a railing around an excavation in a sidewalk, or the work involved is inherently dangerous, such as blasting. See Restatement of the Law 2d, Torts, *supra,* at 395 and 415, Section 416, Comment *a,* and Section 427. Liability is premised on the peculiar risks and special precautions attendant to the work itself, not upon a "holding out"

by an employer that it has assumed a particular duty.[9]

The practice of medicine in a hospital by an independent physician with staff privileges does not involve the type of risks and precautions required as contemplated by the "nondelegable duty" exception. Where the hospital has exercised its independent duty to grant and continue staff privileges only to competent and careful physicians, any remaining precautions attendant to the nonnegligent practice of medicine are the sole responsibility of such independent private physician. Accordingly, we hold that hospitals do not have a nondelegable duty to assure the

---

[8] In *Griffin, supra,* at 231, 522 N.E. 2d at 1104, the court stated:

"The mere practice of medicine in a hospital by a doctor with staff privileges is not of itself sufficient to create an agency by estoppel and hold the hospital liable. See *Klema* v. *St. Elizabeth's Hosp. of Youngstown* (1960), 170 Ohio St. 519, 11 O.O. 2d 326, 166 N.E. 2d 765; *Hannola, supra;* and *Funk* [v. *Hancock*], *supra* [(1985), 26 Ohio App. 3d 107, 26 OBR 317, 498 N.E. 2d 490]. However, where the full-service hospital assumes a nondelegable duty such as the operation of an emergency room facility, the hospital cannot contractually insulate itself from liability for acts of medical malpractice committed in its emergency room by entering into a contract with a third party whereby the third party is to operate the emergency room. In such a situation, the party asserting the agency need not prove induced reliance on his or her part in order to establish the agency relationship."

[9] Comment *b* to Section 416 of the Restatement of the Law 2d, Torts, *supra,* at 396, states:

"The rule stated in this Section applies to one who employs a contractor to do work of the same character as that to which § 413 is applicable. Comment *b* under § 413 is

therefore applicable to this Section, as to the meaning of both 'peculiar risk' and 'special precaution.' " As observed at Comment *b* to Section 413 of the Restatement of the Law 2d, Torts, *supra,* at 385:

"It is obvious that an employer of an independent contractor may always anticipate that if the contractor is in any way negligent toward third persons, some harm to such persons may result. Thus one who hires a trucker to transport his goods must, as a reasonable man, always realize that if the truck is driven at an excessive speed, or with defective brakes, some collision or other harm to persons on the highway is likely to occur. This Section has no reference to such a general anticipation of the possibility that the contractor may in some way be negligent. It is not concerned with the taking of routine precautions, of a kind which any careful contractor could reasonably be expected to take, against all of the ordinary and customary dangers which may arise in the course of the contemplated work. Such precautions are the responsibility of the contractor; and if the employer has exercised reasonable care to employ a contractor who is competent and careful (see § 411), he is not required to provide, in the contract or otherwise, that the contractor shall take them."

absence of negligence in the medical care provided by private independent physicians granted staff privileges by the hospital.

## D

### Agency by Estoppel

The court of appeals also held that Flower Hospital may be liable under the doctrine of agency by estoppel. A number of other Ohio appellate courts' opinions, in addition to *Hannola, supra,* have imposed liability upon hospitals under this doctrine for the negligence of physicians who are independent contractors.[10] This doctrine, which the lower court imprecisely labeled as "apparent agency," "ostensible agency" or "agency by estoppel," was first applied to hospitals in *Grewe* v. *Mt. Clemens General Hosp.* (1978), 404 Mich. 240, 250-251, 273 N.W. 2d 429, 433, as follows: "[I]f the individual looked to the hospital to provide him with medical treatment and there has been a representation by the hospital that medical treatment would be afforded by the physicians working therein, an agency by estoppel can be found."

The majority of jurisdictions which have recognized this type of hospital vicarious liability have done so based on either or both of two sections of the Restatements — Section 267 of Restatement of the Law 2d, Agency, *supra*; and Section 429 of Restatement of the Law 2d, Torts, *supra*. See *Jackson* v. *Power, supra,* at 1380, and cases cited therein; *Pamperin* v. *Trinity Memorial Hospital* (1988), 144 Wis. 2d 188, 205-206, 423 N.W. 2d 848, 854-855. Section 429 requires the

employer to "hold out" the independent contractor as his own employee, and also requires proof that the third party reasonably believed the services were being rendered by the employer or its agents. Section 267 poses a stricter standard, and requires actual reliance upon the representations of the employer that the independent contractor is his employee or agent. See Janulis & Hornstein, Damned If You Do, Damned If You Don't: Hospital's Liability for Physicians' Malpractice (1985), 64 Neb. L. Rev. 689, 696-697.

This court recognizes and approves the doctrine of agency by estoppel akin to Section 267 of the Restatement as an exception to the independent contractor rule, whereby an employer may be liable for the negligence of an independent contractor only if there has been some reliance by a third person upon the representations of the hospital that the physician is its employee or agent, and the injury to the third party was in some manner induced by such reliance.

"The doctrine of agency by estoppel, as it might be invoked by a plaintiff in a tort action, rests upon the theory that one has been led to rely upon the appearance of agency to his detriment. It is not applicable where there is no showing of induced reliance upon an ostensible agency." *Johnson* v. *Wagner Provision Co., supra,* at paragraph four of the syllabus; *Rubbo* v. *Hughes Provision Co., supra; Councell* v. *Douglas, supra,* paragraph four of the syllabus; cf. *Sack* v. *A.R. Nunn & Son* (1934), 129 Ohio St. 128, 1 O.O. 437, 194 N.E. 1; *Jones* v. *J.W. Wills Co.* (1960), 171 Ohio St. 394, 14 O.O. 2d 151, 171 N.E. 2d 710.[11]

---

[10] See *Stratso* v. *Song, supra; Funk* v. *Hancock* (1985), 26 Ohio App. 3d 107, 26 OBR 317, 498 N.E. 2d 490; and *Whitlow* v. *Good Samaritan Hosp.* (1987), 42 Ohio App. 3d 74, 536 N.E. 2d 659.

[11] The doctrine of agency by estoppel at issue here is to be contrasted with the doctrine of implied authority, which is applicable solely in an actual principal-agent relationship. The doctrine of implied

This court has considered vicarious hospital liability premised on this theory only once, in *Cooper* v. *Sisters of Charity* (1971), 27 Ohio St. 2d 242, 254, 56 O.O. 2d 146, 152, 272 N.E. 2d 97, 104. After establishing that the physician in that case was an independent contractor and not under the control of the hospital, we stated:

"Moreover, the practice of medicine by a licensed physician in a hospital is not sufficient to create an agency by estoppel, as alleged by appellant. Nowhere is 'induced reliance' shown by the appellant, as required by *Johnson* v. *Wagner Provision Co.* (1943), 141 Ohio St. 584, to establish such a relationship." *Id.*

*Hannola* and its progeny of cases in the courts of appeals treat this language as mere dictum and proceed to define "agency by estoppel" as applied to hospitals in much broader terms.

The *Hannola* analysis rests on two faulty premises. First, that court relies on the theory of independent duty which we have rejected above. Second, that court holds that, *in every case,* an implied inducement "is established by creating an effect." In that court's

view, the mere existence of a hospital with emergency room facilities constitutes an inducement that all its physicians therein are acting under the hospital's direction and control. This is hardly consistent with that court's statement that the mere practice of medicine by a licensed physician in a hospital is insufficient to create an agency by estoppel.

In order for a hospital to be held liable for the negligent acts of an independent physician with staff privileges, under the doctrine of agency by estoppel, a plaintiff must show: (1) the hospital made representations leading the plaintiff to believe that the negligent physician was operating as an agent under the hospital's authority, *Johnson* v. *Wagner Provision Co., supra; Grewe, supra,* at 250-251, 273 N.W. 2d at 433; and (2) the plaintiff was thereby induced to rely upon the ostensible agency relationship, *Johnson* v. *Wagner Provision Co., supra.* As to this second element, we stress that the question is whether the plaintiff relied on the ostensible agency relationship, *not* whether the plaintiff relied on the reputation of the hospital.[12]

---

authority holds that, where an agent mistakenly acts outside the scope of his authority (for example, makes a contract where he has no actual authority to do so), the principal will be bound nevertheless by the agent's actions if a third party reasonably believed the agent had the necessary authority to so act. *Miller* v. *Wick Building Co.* (1950), 154 Ohio St. 93, 42 O.O. 169, 93 N.E. 2d 467.

[12] The element of reliance is rarely present in an emergency situation such as is presented by this case:

"[P]atients rarely, if ever, would elect to receive emergency medical care at a particular hospital based on the contractual arrangement between the hospital and staff physicians. Most probably, a hospital is

typically chosen on the basis of the geographic proximity of the emergency room to the injury, condition or accident. * * * [A] person needing emergency care does not exercise deliberate and informed choice or 'shop around' for emergency medical care services. Nor is the decision likely ever to be made based upon the employment structure contained within the hospital. More often than not, the receiving hospital is chosen by the driver of the emergency vehicle or private care conveyance and the primary concern of all involved is to get to the closest hospital as quickly as possible. The reputation of the hospital is likely only rarely considered; rather, its convenience is the greatest consideration in the patient's mind, assuming the patient is even conscious at the time."

A review of the record in this case reveals no genuine issue of material fact as to whether Sharon Albain was induced to rely on an ostensible agency relationship between Dr. Abbo and Flower Hospital. Appellee was transported to Flower Hospital by a local paramedics unit solely because Flower Hospital was the closest hospital. Appellee averred that upon her arrival at the hospital she believed "that Flower Hospital would provide me with a physician." Dr. Billings, a hospital resident, then telephoned appellee's personal doctor, who instructed that appellee be cared for by the doctor on obstetrical call. Dr. Billings then called Dr. Abbo, returned to appellee and told her that "the doctor" would be in to see her. Moreover, Dr. Abbo never discussed her employment status with appellee in any manner. We note that appellee did not believe that a physician *who was an employee of the hospital* would be provided her. Nor do we find sufficient facts here to constitute representations by the hospital which would lead appellee to so believe.

Even if we were to find evidence supporting such inducement on the record here, which we do not, we find no evidence which would support the allegation that appellee *relied* on the ostensible agency relationship of Dr. Abbo and the hospital. There is ab-solutely no indication in the record here that appellee would have refused Dr. Abbo's care if she had known Dr. Abbo was not an employee of the hospital. Given this state of the record, we hold that summary judgment in favor of Flower Hospital on the issue of agency by estoppel was proper, and reverse the court of appeals.

## II

Finally, we are asked to determine whether a hospital may be held vicariously liable for the failure of its employees to keep an attending physician fully informed of a patient's condition. The court of appeals determined that it may, and held that a genuine issue exists as to whether the Flower Hospital staff "fully informed Dr. Abbo of all the conditions and circumstances which would or could have affected Dr. Abbo's decision as to the proper course of Mrs. Albain's medical treatment."

It is well settled that a hospital may be held vicariously liable, under the doctrine of *respondeat superior,* for the failure of its employees to follow the orders of an attending physician regarding a patient's medical care. *Klema* v. *St. Elizabeth's Hosp., supra; Jones* v. *Hawkes Hosp. of Mt. Carmel, supra; Johnson* v. *Grant Hospital, supra.* Appellant argues that this represents the full extent of a

*Pamperin* v. *Trinity Memorial Hosp., supra,* 144 Wis. 2d at 218-219, 423 N.W. 2d at 860 (Steinmetz, J., dissenting). Moreover, even in nonemergency situations, patients generally rely on the expertise of the physician, not the physician's employment status. Comment, *supra,* 47 Ohio St. L.J. at 1086.

"For example, the unwritten policy of the City of Columbus, Fire Division regarding the squad and medic units is as follows: In general, take patients to the nearest hospital; take heart patients with stable condition to the hospital where their personal cardiologist admits patients; take dialysis patients to any hospital with a dialysis unit; take children to Childrens Hospital; take patients with burns to Ohio State University Hospitals. Interview with Ms. Susie Barnes, R.N., Emergency Medical Technician Paramedic Instructor, City of Columbus, Division of Fire (Jan. 13, 1986)." Comment, *supra,* 47 Ohio St. L.J. at 1085, fn. 64.

hospital staff's duty toward patients under their care. We cannot agree, as we believe accepted standards of nursing practice include a duty to keep the attending physician informed of a patient's condition so as to permit the physician to make a proper diagnosis of and devise a plan of treatment for the patient. See *Lambert* v. *Sisters of Mercy Health Corp.* (Iowa 1985), 369 N.W. 2d 417, 420.

This duty, and an alleged breach thereof, raise issues of proximate cause. Even assuming that a nurse breached this duty to inform the attending physician of a patient's condition, it must further be shown that such breach was the proximate cause of the patient's injury before the hospital will be held vicariously liable therefor. Thus, a plaintiff must prove that, had the nurse informed the attending physician of the patient's condition at the proper time, the physician would have altered his diagnosis or treatment and prevented the injury to the patient. See *Lambert, supra.* The trier of fact must be provided expert testimony that the injury was more likely than not caused by the nurse's negligence. *Shumaker* v. *Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio

St. 3d 367, 369, 28 OBR 429, 430, 504 N.E. 2d 44, 46; *Cooper* v. *Sisters of Charity, supra,* at 252, 56 O.O. 2d at 151, 272 N.E. 2d at 103-104.

In the present case, appellee's argument as to proximate cause is based primarily on the testimony of Dr. Abbo that she had not been informed by nurse Graves during the telephone call at 3:50 p.m. that Sharon's pad was saturated with bright red blood. Dr. Abbo testified that had she been told about this bleeding she would have come to the hospital sooner. However, Dr. Abbo clearly testified that "sooner" did not mean *immediately* — it simply meant she would not have gone home to eat dinner, but would have come at 5:30 p.m. as she had originally promised.[13] Moreover, Dr. Abbo testified that even if she had gone to the hospital earlier, she would not have done anything differently.

This testimony was crucial to the issue of proximate cause, when compared to that of appellee's expert witness, Dr. Albert Dudley, Jr., who stated that the irreversible damage to Jonathan Albain occurred between 4:00 and 5:00 p.m.[14]

Dr. Abbo testified that *even if* she

[13] "Q. Well, Doctor, let me ask you a question this way: Had you been told that the patient's pad had been saturated with bright red blood, would you have done anything other than that which you did?
"A. I would have come sooner.
"Q. Yes. You would have come sooner —
"A. Yes.
"Q. —had you known that, wouldn't you?
"A. Yes.
"Q. Because that is a very important clinical sign, isn't it?
"A. Yes. Not important clinical sign, but that tells me that the patient is still bleeding more than should be, and I would have gone sooner.

"Q. All right. Now, when you mean sooner, you intended to come at 5:30?
"A. Correct.
"Q. When you were done with your patients?
"A. Correct.
"Q. And when you mean sooner, now if you had known the patient's pad was saturated with bright red blood, you would have interrupted your schedule with your patients?
"A. No, I would not. I still would have gone at 5:30 like I promised."

[14] "Q. Doctor, taking into consideration the signs and symptoms that she presented while she was at Flower Hospital and all the medical records and all the

had been informed of Sharon's bleeding at 3:50 p.m., she would not have arrived at the hospital until 5:30 p.m. as promised. Moreover, it is further instructive as to the issue of proximate cause — relative to the hospital and its employees — that even when Dr. Abbo arrived at the hospital and examined Sharon at 8:00 p.m., she did not believe that the child was in imminent danger or that a cesarean section was immediately required. In her deposition, Dr. Abbo testified that in her opinion Sharon was in stable condition when she was transferred to Riverside Hospital at approximately 8:45 p.m., and Dr. Abbo determined up through that time that a vaginal delivery was still to be contemplated.

We, of course, express no opinion here as to whether Dr. Abbo was negligent in her care of Sharon and Jonathan, as that is yet to be determined in the trial court below. Based on the above testimony before the trial court, however, we hold that appellees failed to establish a genuine issue of material fact as to Flower Hospital's derivative liability for the alleged negligence of its nurses for failing to fully inform Dr. Abbo regarding Sharon's condition. The above testimony demonstrates that even if the nurses were so negligent, such negligence was not the proximate cause of the terrible loss suffered by appellees.

For all the foregoing reasons, the judgment of the court of appeals is reversed, and the trial court's order granting summary judgment in favor of Flower Hospital is reinstated.

*Judgment reversed.*

MOYER, C.J., SWEENEY, WRIGHT, H. BROWN and BRYANT, JJ., concur.

DOUGLAS, J., not participating.

PEGGY BRYANT, J., of the Tenth Appellate District, sitting for RESNICK, J.

---

charts and all the depositions you've had made available to you in this case, do you have an opinion, based to a reasonable degree of medical probability, as to whether the survival of Jonathan Albain was more likely than not had a cesarean section operation been performed at or approximately the 4 to 5:00 hour on April 18, 1984?

"A. Yes, I have an opinion.

"Q. And what is your opinion?

"A. That's the probability of survival would have been more than the probability of mortality.

"Q. Doctor, do you have an opinion, based to a reasonable degree of medical certainty, as to whether there is any time during this afternoon that you can refer to us where irreversible damage begins to set in as a result of failure to perform a cesarean section?

"A. Yes.

"Q. And what is that?

"A. I feel it was approximately 4:00.

"* * *

"Q. Doctor, can you explain to us what irreversible damage you indicated would have taken place at about 4:00?

"A. When, in the process of placental abruption, it is most — the condition is most commonly progressive. It starts as a small area and progressively enlarges as time goes on with the child undelivered. As the process progresses, the degree of deprivation of oxygen increases. The hypoxic state becomes more deep.

"The first permanent loss or damage in hypoxia is in the cerebral cortex, the cortex of the brain, so that can range all the way from very minor alterations of stuttering or a minor visible problem or a minor tick or twitch or something to irreversible damage that is incompatible with death.

"Meanwhile, going through the phases of major disability, cerebral palsy and ultimately no chance of survival. So the irreversible damage I feel began at that point and progressed through the remainder of the time that the infant remained within the uterus."