JOURNAL ENTRY AND OPINION
{¶ 1} Darrell Sullins as executor of the Estate of Loretta Sullins appeals from a judgment of the common pleas court granting University Hospitals of Cleveland's ("UH") motion for a directed verdict and from a judgment entered pursuant to a jury verdict in connection with his medical malpractice action filed against UH. On appeal, Sullins claims that the trial court erred in refusing to charge the jury concerning the standard of care for the treating physicians and in granting UH's motion for a directed verdict. After careful review, we have concluded that these claims are not well taken and, therefore, we affirm the judgment of the court.
 {¶ 2} The record reveals that on September 3, 1999, Sullins filed a medical malpractice complaint against UH, in connection with Loretta Sullins' hospitalization for treatment of rheumatoid arthritis. Mrs. Sullins, then sixty-two years old, had been previously hospitalized at UH by her primary physician, Dr. Van Warren, for treatment of pneumonia from September 7, 1998 to September 13, 1998. On September 18, 1998, she returned to Dr. Warren's office, complaining of severe pain from chronic arthritis in her hips and knees.
 {¶ 3} The admitting note and history provided by Dr. Warren contained a history that did not include the fact that Mrs. Sullins had previously come into contact with pulmonary tuberculosis as a supervisor at Harbor Light, a halfway house in Cleveland, and was prone to test positive for that disease. It is undisputed that she was not exhibiting any signs of a currently active tuberculosis infection upon admission and the nurse's Patient History taken at each admission noted only a history of arthritis, stomach problems, and ulcers, but did not note any history of seventeen other conditions/diseases, including diabetes, tuberculosis and kidney problems.
 {¶ 4} Dr. Warren supervised Mrs. Sullins' care and ordered medication to treat her arthritis. On September 23, 1998, among other tests, he requested materials for a tuberculin PPD ("PPD") test used to determine whether a patient has ever been exposed to tuberculosis, and changed her pain medications because the nurses' notes and her family had indicated that she was intermittently disoriented. She also complained of a headache on one occasion that seemed to have resolved itself, and complained of radiating lower back pain.
 {¶ 5} On Sunday, September 27, 1998, Nurse Betsy Sykora (nka Betsy Kirschner), noted the tests had not been performed and asked Mrs. Sullins whether she recalled having been given them. Mrs. Sullins said "no," but also indicated that she always tested positive for a PPD test, and that chest x-rays had been needed in the past to determine the activity status of the dormant tuberculosis to which she had been exposed through her employment. Nurse Sykora wrote a notation on Mrs. Sullins' medical chart that the tests had not been done and noted Mrs. Sullins' reactor-status to PPD tests.
 {¶ 6} That same day, Dr. Moscowitz, covering for Dr. Warren, requested a consultation from UH's infectious disease department, known as an "ID consult," to determine what alternate antibiotics could be given to Mrs. Sullins, because the intravenous ones originally prescribed had caused a side-effect: phlebitis, or swelling of veins. He also requested an evaluation of possible drug treatment for "septic arthritis," since he suspected some sort of infection may have been causing swelling in her right knee.
 {¶ 7} The infectious disease attending physician, Dr. Michael Lederman, had left for the day, so Dr. Woolley, an infectious disease fellow in training at UH, answered the call for the consultation. He charted his recommendation for the use of some broad, non-IV, non-tuberculosis-treating antibiotics. The next day, he and Dr. Lederman went to Mrs. Sullins' room but were unable to see her because she was undergoing a bone scan. While Dr. Woolley claimed that someone from the UH rheumatology department later informed him that the consultation was not necessary, Dr. Warren countered that he never terminated the request. In any event, no further ID consultation was either initiated by Dr. Warren or pursued by Dr. Woolley or Dr. Lederman.
 {¶ 8} Mrs. Sullins' condition continued to deteriorate, and on October 5, 1998, a spinal tap revealed elevated protein and lymphocyte levels in her cerebrospinal fluid. This indicated tuberculous meningitis, or swelling of the tissues covering the brain caused by a tuberculosis infection which had progressed in her central nervous system. Tuberculosis therapy was then initiated. She then developed hydrocephalus, or "water on the brain." As her tuberculous meningitis increased in severity, she lapsed into a coma on October 7, 1998, and four days later, upon the advice of intensive care physicians, Darrell Sullins agreed to terminate his mother's life support and she died.
 {¶ 9} An autopsy concluded that her cause of death included tuberculous meningitis, progressive hydrocephalus, rheumatoid arthritis, and a subarachnoid bleed caused by a shunt that ICU doctors had placed in Mrs. Sullins' skull in an effort to alleviate some of the pressure caused by the meningitis or hydrocephalus.
 {¶ 10} Sullins filed suit against UH and various physicians including Dr. Warren. He settled with Dr. Warren, voluntarily dismissed claims against all other physicians and proceeded against UH based on the alleged negligence of Dr. Woolley and the nursing staff. At trial he argued that the nursing staff had failed to initiate internal UH protocols designed to screen for, or alert physicians to, the possibility of a tuberculosis-related illness, and that failure inhibited its discovery and diagnosis. He alleged that Dr. Woolley, as a fellow in training, was negligent in providing the ID consult, both in undertaking it on his own, and in failing to diagnose tuberculous meningitis on September 26, 1998. He alleged that the combination of the nursing care and the consult delayed detection of and, therefore, the treatment for, tuberculosis until it was too late to be effective.
 {¶ 11} UH countered that Dr. Warren, as Mrs. Sullins' primary and admitting physician, controlled the care given, and bore sole responsibility for the delayed diagnosis of tuberculous meningitis. At trial, Sullins' medical expert, Dr. Hosea, testified that the nurses were not negligent and that they could not be expected to make a diagnosis of tuberculosis.
 {¶ 12} At the close of evidence, the trial court directed a verdict for UH on the nursing negligence claim. The jury then returned a verdict for UH on Sullins' claim of Dr. Woolley's negligence.
 {¶ 13} Sullins now appeals and presents four assignments of error. The first assignment of error states:
 {¶ 14} "The trial court committed reversible error when it failed to charge the jury with the plaintiff's proposed jury instructions as found in plaintiff's proffered Exhibits 1 and 2. TR.1500-04."
 {¶ 15} Sullins contends the court erred in failing to instruct the jury that UH could be found liable for the alleged violations of the standard of care by Dr. Woolley and by Dr. Woolley's supervising physician, Dr. Lederman. Sullins requested jury instructions calling for a determination that if he established by a preponderance of the evidence that if either Dr. Woolley or Dr. Lederman breached the applicable standard of care, UH would be liable. The court denied the request and gave instructions only on the issue of whether Dr. Woolley met the standard of care.
 {¶ 16} It is well established that the trial court may not instruct the jury if there is no evidence to support an issue. Murphy v.Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585, 591, citing Riley v.Cincinnati (1976), 46 Ohio St.2d 287, 75 Ohio Op.2d 331. According toFeterle v. Huettner,(1971), 28 Ohio St.2d 54 at the syllabus: "In reviewing a record to ascertain the presence of sufficient evidence to support the giving of a[n] * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction."
 {¶ 17} Sullins submits that this court should create a limited form of corporate liability for a hospital when it provides a trainee as a consultant in the treatment provided by the patient's personal treating physician, and that independent supervising physician negligently oversees the trainee.
 {¶ 18} The Ohio Supreme Court, however, has specifically refused to endorse such a broad "corporate liability" in a hospital setting and has, instead, crafted limited exceptions to the general agency principle that an independent contractor-physician who is granted staff privileges will not subject a hospital to liability for his own negligence. Albainv. Flower Hosp. (1990), 50 Ohio St.3d 251. In our reading of Albain, it is clear that the court resolved this issue in the following statement at 259:
 {¶ 19} "We are aware that a number of our sister jurisdictions have expanded the independent duty of hospitals so as to require them to totally ensure the patient's safety while at the hospital. This expansion of a hospital's duties, including a duty to oversee a physician's care of individual patients and a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patient, has progressed in varying degrees, under the moniker of `corporate negligence,' towards imposing strict liability upon hospitals. * * * We are not convinced of the wisdom of such expansive liability and, accordingly, we hold that a hospital may be held directly liable for the malpractice of an independent physician with staff privileges only [in limited, well-defined circumstances]."
 {¶ 20} The rationale advanced by Sullins ignores the fact that, by virtue of his supervision of a trainee, a physician with staff privileges at a teaching hospital is practicing medicine by lending his expertise and may be found liable for negligent supervision of a trainee, even where his negligence comes in the form of not seeing a patient to evaluate the trainee's performance. See Lownsbury v. Van Buren (2002),94 Ohio St.3d 231, 2002-Ohio-646.
 {¶ 21} Sullins claims he did not learn of Dr. Lederman's involvement in his mother's care until after the statute of limitations had run and could not raise any individual claims against him or through him under permissible agency by estoppel principles. Clark v. SouthviewHospital Family Health Ctr. (1994), 68 Ohio St.3d 435. He, therefore, asks that we allow imputation of liability against UH for any of Dr. Woolley's alleged negligence, based on Dr. Lederman's purported failure to supervise him. While other jurisdictions have allowed this, Ohio courts have not, and we decline to endorse a departure from the Supreme Court's pronouncement in Albain.
 {¶ 22} Alternatively, Sullins submits that, when a hospital provides a trainee to an attending physician with staff privileges for a requested consult, it assumes a non-delegable duty to oversee the work of the trainee, notwithstanding the supervisory physician's responsibilities. In rejecting an identical theory, the Albain Court held:
 {¶ 23} "At least two lower courts have extended the non-delegable duty exception to a hospital providing independent physicians in the operating room, (anesthesiologist), and to a hospital contracting with third-party physicians to operate the hospital's emergency room facility. Griffin v. Matthews (1987), 36 Ohio App.3d 228. Those decisions are inapplicable here, and we conclude that they represent misdirected attempts to circumvent the necessity of proving agency by estoppel, and confuse the proper scope of a hospital's duty in selecting competent physicians as [established by the Albain opinion]."
 {¶ 24} This court agrees. See Petratos v. Markakis (1993),92 Ohio App.3d 626. In Petratos, supra, the plaintiffs asserted that the hospital had a non-delegable duty to monitor a patient's care and intervene, if necessary, once negligence in the care had occurred.92 Ohio App.3d at 628. Following Albain, this court held that a hospital "is not the insurer of the skills of physicians to whom it has granted staff privileges," and therefore, the non-delegable duty rule does not apply to the hospital for the negligence of its staff physicians. Id. at 630.
 {¶ 25} Accordingly, this assignment of error is without merit and it is overruled.
 {¶ 26} The second assignment of error states:
 {¶ 27} "The trial court committed reversible error when it failed to charge the jury with the plaintiff's proposed jury instructions as found in plaintiff's proffered Exhibits 1 or 1(A). TR. 1500-04."
 {¶ 28} Sullins contends the court abused its discretion in failing to give the instruction that the standard of care for a fellow should be the same standard of care as that of a practicing physician giving treatment and not that of a similarly situated and educated fellow. UH argues the court correctly refused to give Sullins' instruction and gave the proper instruction. The instruction given to the jury stated:
 {¶ 29} "Now, the existence of a fellow physician-patient relationship imposes on the fellow physician the duty to act as would a fellow physician of ordinary skill, care and diligence at the same stage of his training under like or similar circumstances."
 {¶ 30} For doctors in training (interns, residents or fellows), the standard of care is that of a doctor of ordinary skill, care and diligence at the same stage of his training, under like or similar circumstances. Rush v. Akron General Hospital (1957), 84 [Ohio L. Abs.] 292, 295.
 {¶ 31} In Rush, the plaintiff sought to hold a hospital vicariously liable for the negligence of an intern employed by the hospital. The Summit County Court of Appeals determined that:
 {¶ 32} "The standard of care, diligence or skill employed in the examination and treatment of such cases [as the plaintiff's] by competent physicians and surgeons practicing in this community * * * is not absolute in all cases. It would be unreasonable to exact from an intern, doing emergency work in a hospital, that high degree of skill which is impliedly possessed by a physician and surgeon in the general practice of his profession, with an extensive and constant practice in hospitals and the community.
 {¶ 33} "What is required in the case of an intern is that he shall possess such skill and use such care and diligence in the handling of emergency cases as capable medical college graduates serving hospitals as interns ordinarily possess under similar circumstances, having regard to the same or similar localities, and the opportunities they afford for keeping abreast with the advances in medical and surgical knowledge and science." Id. at 295.
 {¶ 34} This court has followed Rush and has applied it repeatedly to determine the liability of interns, residents, or fellows in medical malpractice cases. See Copeland v. University Radiologists of Cleveland,Inc. (Apr. 22, 1993), Cuyahoga App. No. 62332.
 {¶ 35} We hold that the court did not abuse its discretion in instructing the jury that Dr. Woolley's actions were to be evaluated against the standards of fellows, and not those of practicing physicians. This assignment of error is without merit and it is overruled.
 {¶ 36} The third assignment of error states:
 {¶ 37} "The trial court committed reversible error when it granted the defendant's motion for directed verdict. TR 1380." Sullins contends that there was no basis for granting a directed verdict in favor of UH on his claims for its nurses' negligence. UH contends that Sullins' own medical expert conceded there is no evidence of nurses' negligence.
 {¶ 38} Civ.R. 50(A)(4) sets forth the standard for ruling on a motion for a directed verdict. It states:
 {¶ 39} "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 40} A directed verdict is appropriate where the party opposing it has failed to adduce any evidence on the essential elements of his or her claim. Glover v. Boehm Pressed Steel Co. (1997), 122 Ohio App.3d 702. A motion for a directed verdict tests the legal sufficiency of the evidence to take the case to the jury and, therefore, presents a question of law, not one of fact. Wagner v. Midwestern Indemn. Co. (1998),83 Ohio St.3d 287, 294.
 {¶ 41} It is well settled in Ohio that in order to prevail in a medical malpractice claim, a plaintiff must demonstrate through expert testimony that, among other things, the treatment provided did not meet the prevailing standard of care.
 {¶ 42} "Proof of the recognized standards must necessarily be provided through expert testimony. This expert must be qualified to express an opinion concerning the specific standard of care that prevails in the medical community in which the alleged malpractice took place, according to the body of law that has developed in this area of evidence." Bruni v. Tatsumi (1976), 46 Ohio St.2d 127.
 {¶ 43} Expert testimony is necessary to establish the prevailing standard of care where the professional skills and judgment of a nurse are alleged to be deficient. Ohio courts have long recognized this principle.
 {¶ 44} "Where the issue is one of an exercise of judgment or skill requiring the specialized training of a nurse, expert-opinion evidence would be required." Johnson v. Grant Hosp. (1972), 31 Ohio App.2d 118,124-125, reversed on other grounds (1972), 32 Ohio St.2d 169.
 {¶ 45} Under the doctrine of respondeat superior, a hospital is liable for the negligent acts of its employees. Klema v. St. Elizabeth'sHosp. of Youngstown (1960), 170 Ohio St. 519, paragraph two of the syllabus. "In a negligence action involving the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury." Ramage v. Cent. Ohio Emergency Serv., Inc. (1992),64 Ohio St.3d 97, paragraph one of the syllabus. However, expert testimony is not required in a negligence action involving conduct within the common knowledge and experience of jurors. Id.
 {¶ 46} Dr. Hosea testified that the nurses were not negligent and that they could not be expected to make a diagnosis of tuberculosis. The record here reflects the following colloquy during Dr. Hosea's cross-examination at page 229 of the transcript:
 {¶ 47} "Q. [By M. Taber] You said that the diagnosis of these conditions is very difficult in the best of circumstances and usually requires a high index of suspicion. Those are your words, true?
 {¶ 48} "A. That's true.
 {¶ 49} "Q. So, you most certainly would not have expected thenurses to make the diagnosis in this case, true?
 {¶ 50} "A. That's true." (Emphasis added)
 {¶ 51} Later at transcript page 230, the following appears:
 {¶ 52} "Q. You had the autopsy report in the initial packet that Mr. Carlin sent you way back when, didn't you?
 {¶ 53} "A. I certainly did.
 {¶ 54} "Q. You certainly don't blame any nurses in this case forcausing the death of Mrs. Sullins, do you?
 {¶ 55} "A. No." (Emphasis added)
 {¶ 56} Based on this testimony, we hold that the trial court properly directed a verdict in favor of the hospital regarding the alleged negligence of the nurses involved in this case. This assignment of error is without merit and is overruled.
 {¶ 57} The fourth assignment of error states:
 {¶ 58} "The trial court committed reversible error when it failed to follow the mandates of Rule 50(E) of the Ohio Rules of Civil Procedure. TR. 1380."
 {¶ 59} Sullins contends that the trial court judge failed to state his reasons for granting the directed verdict as mandated by Civ.R. 50(E). It is undisputed that no specific findings were made on the record, but this does not warrant remand.
 {¶ 60} The rationale for reversing an entry of a directed verdict, unaccompanied by stated reasons, can be summarized as follows:
 {¶ 61} "Rule 50(E) requires the trial court to narrow its focus to the particular area of deficiency alleged by the movant. By doing so, an unsuccessful non-movant is put on notice as to where the case has failed. This permits the non-movant a realistic and practical basis upon which to decide whether or not to seek review of the decision. The rule also enables a reviewing court to refrain from expending inordinate resources in reviewing an entire record to see if every element of every claim has been established in the absence of a prior suggestion by the trial court that they have not been." See Pusey v. Greif Bros. Corp.
(1997), 124 Ohio App.3d 725, 729-730.
 {¶ 62} As the Twelfth District Court of Appeals stated in Campbellv. Pritchard (1991), 73 Ohio App.3d 158, "[a]lthough Civ.R. 50(E) provides that the trial court shall state the basis for its decision to direct a verdict, the party against whom the motion is granted waives his right to protest the absence of this requirement by failing to timely raise the error to the trial court. * * * If further explanation was required, it was incumbent upon appellant to request such from the trial court. Grange Mut. Cas. Co. v. Fleming (1982), 8 Ohio App.3d 164." The issues concerning the directed verdict were argued by the parties on the record. Sullins did not object to the oral order nor did he request written findings by the court. Because Sullins did not make such a request, he waived any Civ.R. 50(E) insufficiency argument.
 {¶ 63} Accordingly, this assignment of error is without merit and is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, J., CONCURS; ANNE L. KILBANE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE CONCURRING AND DISSENTING OPINION.