**Vincent J. BEDDIA and Betty Beddia, Plaintiffs–Appellants,**

**v.**

**Dwight GOODIN, et al., Defendants,**

**Jamboree USA, Inc., Defendant–Appellee.**

No. 91–3414.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 4, 1991.

Decided Feb. 24, 1992.

Dennis R. Lansdowne (argued and briefed), Spangenberg, Shibley, Traci & Lancione, Cleveland, Ohio, for plaintiffs-appellants.

James August Readey (argued and briefed), Bricker & Eckler, Columbus, Ohio, for defendants-appellees.

Before GUY, Circuit Judge, WELLFORD, Senior Circuit Judge, and CHURCHILL, Senior District Judge.*

CHURCHILL, Senior District Judge.

Plaintiffs appeal from summary judgment for the Defendant in this diversity action for personal injuries suffered while riding as passengers on a shuttle bus. For the reasons that follow, we affirm.

## I.

Plaintiffs Vincent and Betty Beddia alleged that on July 14, 1984 they suffered personal injuries while in attendance at the Jamboree In The Hills Music Festival in Belmont County, Ohio.

The festival, held annually since 1977, is a creature of Defendant Jamboree USA, Inc. ("Jamboree USA") and it attracts fifty to sixty thousand people each year. The event was held at Brush Run Park which is owned by Guy and Virginia Alderman. Jamboree USA uses the park pursuant to a contract with the Aldermans.

In 1984, as during previous years, on-site camping was available for some of the people who attended the event. Campground #6 was the on-site campground farthest from the show area and was serviced by a free shuttle bus provided for the campers. The land was, in fact, owned by one Robert

Fleagane, but was leased by the Aldermans for the Jamboree. The Beddias, on their first visit to the festival, were staying at campground #6.

Under the contract between Jamboree USA and the Aldermans, signed in 1984, responsibility for the campgrounds and campers fell upon the Aldermans. Pursuant to Section 10 of the contract the Aldermans agreed to the following:

10. *Camping.* Aldermans have exclusive right to camping proceeds in connection with Jamboree in the Hills. Aldermans are entitled to all proceeds from camping.

. . . . .

Aldermans will be responsible for securing camping permits, security personnel, insurance, parking personnel, bus shuttle services, and all goods and services needed for camping and shall contract for such goods and services directly and shall pay for them directly.

Section 12 of the agreement provides:

12. *Maintenance, Repair And Preparation of Brush Run Park.* Aldermans' general and primary obligation is to have Brush Run Park in as good condition and repair for each Jamboree in the Hills as it was for the 1983 show, reasonable wear and tear excepted. Specifically, Aldermans' duty to repair and maintain applies to the following items as they existed for the 1983 Jamboree in the Hills:

Stage Building.

Electrical system.

Lighting system.

*Access roads.* (Emphasis added).

Water lines.

Parking areas.

Under the heading "Jamboree's Obligations" Section 18 provides:

18. *Parking.* Jamboree shall provide, at its expense, personnel to handle parking at Jamboree in the Hills (*with the*

* The Honorable James P. Churchill, Senior United States District Judge for the Eastern District    of Michigan, sitting by designation.

*exception of camping areas* ). (Emphasis added).

Section 21 of the agreement provides for insurance and states the following:

> 21. *Insurance.* Jamboree shall maintain public liability insurance against property damage or personal injury growing out of the use of Brush Run Park (*with the exception of camping areas* ) for a reasonable period before and after each Jamboree in the Hills. (Emphasis added).

In 1984 the shuttle bus service was provided by Ambassador Transportation Company, which was owned by David Goodin.[1] Prior to 1984, Goodin had been paid by Jamboree USA, but in 1984 he orally contracted with and was paid by the Aldermans.

The only other significant participant pertinent to this appeal is the Ohio Valley Jaycees. The Jaycees, in exchange for a donation to their organization and free tickets to the Jamboree in the Hills, volunteered for traffic duty. The Aldermans arranged for their participation, made the donation, and gave them tickets from the package of tickets given to them by Jamboree USA. With respect to campground # 6, the Jaycees duty was to keep private vehicles off the single-lane service road that the shuttle buses were to use to get to and from Campground # 6.

Plaintiffs have evidence to support that the particular shuttle bus in which the Beddias were riding, from the stage to the campground, was proceeding up the narrow road when it suddenly encountered an oncoming vehicle. The driver swerved to avoid a collision, and momentarily left the road. There was no collision or accident, but allegedly the Beddias were thrown about the bus. Mr. Beddia allegedly landed upon a nerve implant stimulator in his back and has suffered a severe exacerbation of his multiple sclerosis.

The Beddias emphasize other facts which are recounted here. First is the content of the brochures put out by Jamboree USA in promotion of its event. There were two brochures upon which plaintiffs rely, one general in nature and the other entitled "Campers Information Brochure." As to the general brochure, the Beddias point out that, although it describes the camping facilities, it does not mention the Aldermans. It also states that:

> "Jamboree in the Hills" is an expertly-organized, rain or shine event that's now in its eighth historic year. A testimony to festival pre-planning and coordination, it's sponsored by Jamboree U.S.A., and radio station WWVA your trusted country music friends for almost half a century.

The campers brochure states that the event is presented by Jamboree USA and explains that "[t]he campgrounds are filled and arranged by our camping director and his staff." In addition, under the heading "Security" the brochure states that "Security personnel are on duty 24 hours daily for the duration of the show. The entire site, campgrounds and show area, is secured." Again the Aldermans' names do not appear in the brochure.

Second is the fact that Jamboree USA handled some of the pre-event camping reservations and sold camping stickers. Jamboree USA received a fee from the Aldermans for performing this service. The $3,500 fee was allegedly less than 10% of the camping revenues.

Third is the testimony and activities surrounding some of the supervisory personnel employed by Jamboree USA. Specifically, it is asserted that Jamboree USA exercised some control over the bus service and the Jaycees.

## II.

We review a grant of summary judgment de novo. *EEOC v. University of Detroit,*

---

1. David Goodin, individually and as owner of Ambassador, and Dwight Goodin, the driver of the shuttle, were named as defendants in the original complaint. After the court granted defendant Jamboree's independent motion for summary judgment, the case against the remaining defendants was settled and dismissed. The only defendant pertinent to this appeal is Jamboree USA.

904 F.2d 331, 334 (6th Cir.1990). Summary judgment is appropriate if no genuine issue of material fact exists. *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988). A material issue of fact exists where disputed evidence is sufficient to support a verdict in favor of the non-moving party by a reasonable finder of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2510 (citations omitted).

Plaintiffs make three arguments on appeal as to why the lower court erred in granting summary judgment: (1) Jamboree USA is legally responsible for the acts of Ambassador Transportation and its driver and the Ohio Valley Jaycees since they were servants of Jamboree USA; (2) Jamboree USA is estopped to deny the agency of Ambassador Transportation and its driver and the Ohio Valley Jaycees; and (3) Jamboree USA is responsible for its own negligence.

### A.

■ The contention that liability may be imposed based upon a master-servant or loaned servant relationship was specifically rejected by the court below. The test is whether "the employer retain[ed] control, or the right to control, the mode and manner of doing the work contracted for." *Councell v. Douglas*, 163 Ohio St. 292, 126 N.E.2d 597, 599 (1955). It is not necessary that the control ever be exercised. *Baird v. Sickler*, 69 Ohio St.2d 652, 655, 433 N.E.2d 593, 595 (1982). The relationship is asserted as to both the shuttle service and the Jaycees.

With respect to the shuttle service, plaintiffs first rely upon a comment by the vice-president and general manager of Jamboree USA to show control.

Q Was Jamboree USA involved at all, to the best of your recollection, in supervising or instructing the shuttle bus service in 1984 from Campground # 6?

A No, only to, perhaps, Terry Mowrey under his jurisdiction would probably be concerned about making sure that the, that it's operated properly. That it got the fans there on time, that they were used for that purpose of giving good service back and forth.

In follow-up, it was indicated that Jamboree USA had no involvement in the selection of bus drivers. Nor did Jamboree USA choose the routes or schedules that the bus drivers use. Finally, it was noted that the Aldermans, and not Jamboree USA, contracted and paid for the bus service.

Plaintiffs secondly point to two comments by the owner of the bus company. First is a statement by Goodin that he received the armband passes needed by his bus drivers from Terry Mowrey, an employee of Jamboree USA. Second, in response to the question "You were not hired by a company called Jamboree USA, Inc.?" the owner David Goodin replied: "No, but I did take instructions from them too. That is something—as I say I'm in the middle."

However, in the same deposition he was pointedly asked whether anyone from Jamboree USA gave him specific instructions about how to run the shuttle bus service in 1984. Goodin responded that "I've never had any other instructions except for the first year I was down there."

In addition, Goodin stated that the Aldermans "tell me the hours they need it and I will basically run the show over there as far as the busses." They also told him that they might need more busses that year. Based upon the testimony of these two individuals, plaintiffs argue that an issue of material fact is presented. We cannot agree.

As to the testimony of the vice-president, it reveals an interest "merely in the ultimate result to be accomplished." *Councell v. Douglas*, 126 N.E.2d at 599. At best, Jamboree USA was assuring itself that the Aldermans were complying with their contractual obligations. That is insufficient. *Id.*

Goodin's testimony, if taken out of context, is somewhat conflicting. The plain-

tiffs, however, bear the burden of showing control. Nothing is presented to indicate that Goodin's comment that he received instructions is attributable to 1984. In addition, if there were any instructions forthcoming from Jamboree USA to Goodin in 1984, the content of those instructions has not been presented. Specifically, it has not been shown that the content of the instructions, if any, indicated the right to control the mode and manner of the work.

▆▆ As to the Jaycees, plaintiffs' argument is rather conclusory.[2] Plaintiffs note that the original source of the passes given to the Jaycees was Jamboree USA. Therefore, plaintiffs argue, it "is inconceivable that the creator and promoter of this 50,-000 plus person event had no right to direct these people whom it compensated with free tickets." They also assert that the Jaycees would come to Terry Mowrey of Jamboree USA to coordinate their work with him. As an example of how the control should be inferred, plaintiffs note that historically David Goodin complained to Mr. Mowrey, and not the Aldermans, about Jaycees' misbehavior.

In response, Jamboree USA notes that the tickets received by the Jaycees were given to the Aldermans as part of Jamboree USA's agreement with them. Under the contract, the bus company and the parking attendants were to be obtained by and were responsible to the Aldermans. The Aldermans presumably could have hired individuals to do the work, but they arranged for volunteers and compensated them with a donation and free tickets.

The court finds no error in the position of Jamboree USA and the decision of the district court that the evidence presented on this argument of plaintiffs does not create an issue preventing summary judgment. There is simply no evidence that Jamboree USA had a right to control the "mode and

manner" of the Jaycees' work. At most, Jamboree USA had an interest in the "ultimate result" of the traffic control. Any right to control the "ultimate result" is not enough to create a master-servant relationship under *Councell*, 126 N.E.2d at 599.

Nor may the ability to control be inferred in this instance. In light of the 1984 contract giving substantial authority to the Aldermans, the presumption is that if the obligations under the contract were not being fulfilled, Jamboree USA would have looked to the Aldermans for a cure. There is no evidence presented upon which a different inference may be drawn.

## B.

The second argument presented by the Beddias is that the lower court erred on the issue of agency by estoppel because the evidence established that the defendant made representations that others were its agents and plaintiffs were induced to rely on those representations. The previously described excerpts from the brochures are cited.

Jamboree USA asserts that there is no evidence that the Beddias read any brochure and, in fact, they testified that they had not.

In *Councell v. Douglas*, the Ohio Supreme Court held:

> A person is not liable in tort for the act of another who is not his servant or agent, even where such person has manifested to a third person that such other is his agent or servant, except where there has been some reliance by such third person upon the appearance of a principal and agent or master and servant relationship and then only if a subsequent harm is in some manner induced by that reliance.

---

**2.** Raised only in reply, plaintiffs suggest that the statement in the brochure which says "[t]he Jamboree USA staff will handle everything this year, including the campgrounds," indicates control. It is argued that reliance is not required here as it is in the agency by estoppel argument presented below. Without the benefit of reliance, however, this printed material is of little value to plaintiffs' argument. A statement in a brochure might indicate control to another, but it does not indicate either actual or an inferable right to control such as one might find in a contract. Here, the contract clearly indicated that actual control was in the hands of the Aldermans.

*Councell,* 126 N.E.2d at 598 (syllabus). In addition, Restatement 2d Agency § 267, approved by the Ohio Supreme Court in *Albain v. Flower Hosp.,* 50 Ohio St.3d 251, 553 N.E.2d 1038 (1990) provides:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care and skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

The brochures contain non-specific statements that say nothing about the quality of shuttle bus service or guarantee *traffic* safety within the campgrounds. Therefore, there is some doubt as to whether there is indeed a representation upon which one could justifiably rely. More importantly, there is a lack of evidence that the plaintiffs did indeed rely on anything. They did not receive or read any brochures. Mr. Beddia testified that he did not even know there was a shuttle service before he arrived. The busses had Ambassador Transportation written on the side, not Jamboree USA. Nor were the Jaycees "labeled" in any way to indicate that they were Jamboree USA employees. Because there was no reliance shown by plaintiffs, summary judgment on this issue was proper.

### C.

█ The validity of the plaintiffs' theory that Jamboree USA was itself negligent depends on the existence of a duty to prevent a known dangerous physical condition upon the premises of another, to take steps to gain control over the conduct of a third person or to take steps to protect the plaintiffs from the negligence of third persons.

█ The Ohio law is established that a prospective invitor has no duty to a potential invitee to exercise control over the premises of another over which his prospective invitee must pass. *Beaney v. Carlson,* 174 Ohio St. 409, 189 N.E.2d 880 (1963). One having neither occupation nor control of premises ordinarily has no legal duty with respect to the condition or use of those premises. *Brown v. Cleveland Baseball Co.,* 158 Ohio St. 1, 106 N.E.2d 632 (1952).

In *Beaney v. Carlson,* the Ohio Supreme Court faced the question of whether a business lessee may be liable for injury to a patron of the lessee from a condition on a portion of the premises not included in the leasehold. The court noted that liability is an incident of occupation or control of the premises.

In that case, the grocery store tenant was held, as a matter of law, not liable to a patron who sustained injuries when struck by an automobile inadvertently driven onto the store's sidewalk while its driver was attempting to park in the icy lot in front of the store. The court noted that the accident resulted from a failure to erect a suitable barrier to keep automobiles off the sidewalk, which under the circumstances would have had to have been erected in the parking lot. As with this case, the lease in *Beaney* provided that the lessor was required to maintain the portion of the premises where the injury occurred.

This court finds the *Beaney* decision to be on point and dispositive. The injured persons in both *Beaney* and this case are similar in that they are business invitees of the tenant businesses. Also, the areas in question, while plausibly within the scope of the invitation, are outside the occupation and control of the businesses. Rather, the areas in question are by lease and/or contract to be maintained by persons other than the defendant. In such a situation, *Beaney* directs that no duty is imposed upon the defendant tenant.

The court would also note, as indicated in the discussion in section A of this opinion, that no other indicia of control or occupation of the premises in question are evident. No evidence indicating a power and right to admit specific individuals to Campground # 6 or to exclude them from Campground # 6 was presented or suggested.

█ It is the further opinion of the court that Ohio law does not impose a duty on Jamboree USA to gain and exercise control

over the shuttle bus operator or to protect the plaintiffs from the negligence of third persons over which the defendant did not exercise control. *Gelbman v. Second Nat. Bank,* 9 Ohio St.3d 77, 458 N.E.2d 1262 (1984).

## III.

For the reasons stated above, we AFFIRM the grant of summary judgment to Jamboree USA.