CITY OF TROTWOOD et al., Appellees,

v.

SOUTH CENTRAL CONSTRUCTION, L.L.C., et al., Appellants.

[Cite as *Trotwood v. S. Cent. Constr., L.L.C.*, 192 Ohio App.3d 69, 2011-Ohio-237.]

Court of Appeals of Ohio,
Second District, Montgomery County.

Nos. 23689 and 23772.

Decided Jan. 21, 2011.

Altick & Corwin, L.P.A., Stephen M. McHugh, and Robert F. Jacques; and Jeffrey C. Turner and Dawn M. Frick, for appellee city of Trotwood.

Green & Green, Jane M. Lynch, and Jared A. Wagner; and Cooper, Gentile & Washington, Dwight A. Washington, and Diane Gentile, for appellee Trotwood–Madison City School District.

Brannon & Associates, Dwight D. Brannon, and Matthew C. Schultz; and Richard Donenfeld, for appellants.

Freund, Freeze & Arnold, Shawn Blatt, and Amy Burma, for Wyco Consulting, Inc.

BROGAN, Judge.

{¶ 1} This matter comes before the court upon two consolidated appeals filed by a number of residents of Trotwood, Ohio.  The residents first appeal from the

trial court's entry of a declaratory judgment in favor of appellees the city of Trotwood and the Trotwood–Madison City School District ("TMCSD"). The residents also appeal from the trial court's entry of summary judgment in favor of appellee Wyco Consulting, Inc. on their cross-claim seeking to hold Wyco partially responsible for damages due to flooding in their basements.

{¶ 2} The Trotwood residents advance four assignments of error on appeal. First, they contend that the trial court erred in granting summary judgment to the city of Trotwood. Second, they claim that the trial court erred in granting summary judgment to TMCSD.[1] Third, they assert that the trial court erred in granting summary judgment to Wyco. Fourth, they allege that the trial court erred in overruling their motion for leave to file an amended answer, counter-claim, cross-claim, and third-party claims.[2]

{¶ 3} The present appeal stems from flooding that occurred when a sewer line apparently was left uncapped during the demolition of an old high school. In its ruling, the trial court succinctly set forth the underlying facts as follows:

{¶ 4} "This case arises out of the demolition of TMCSD's old high school located at 221 Trotwood Blvd., Trotwood, Ohio, 45426. TMCSD owns this property. The old high school was demolished as part of a larger overall scheme of construction throughout the district involving the construction of several new buildings including a new high school. In the fall of 2005, TMCSD contracted with South Central Construction, LLC (hereinafter 'South Central') for the demolition of the building. The City of Trotwood was not a party to the contract. Fanning/Howey Associates Inc. (hereinafter 'Fanning') was responsible for de-signing the demolition plan and specifications for the high school—i.e. architect for the project. With regard to the utility lines, including the laterals, the specifications provided:

{¶ 5} " '2.1.1 The Contractor shall be responsible for and have control over all construction means, methods, techniques, sequences, procedures for all portions of the Contractor's Work and shall be responsible for any injury or damage which

---

**1.** Although the residents have appealed from a ruling entering *declaratory judgment* in favor of the city of Trotwood and TMCSD, that ruling incorporated by reference the reasoning in a separate ruling that entered *summary judgment* in favor of the city of Trotwood and TMCSD.

**2.** Also pending before us is a collateral issue involving the residents' August 25, 2010 submission of supplemental authority. Appellee TMCSD urges us not to consider the supple-mental cases cited by the residents, because all but one of the cited cases were decided prior to briefing and oral argument and therefore were available to the residents earlier. After due consideration, we nevertheless have decided to allow the residents' supplementation, as we have our own obligation to be aware of existing law and the supplementation assists us in that regard.

may result from improper construction, installation, maintenance, or operation to the fullest exten[t] permitted by law.'

{¶ 6} " '3.06 [B] Fill the open ends of abandoned sewers or drains encountered in excavation with concrete or masonry, as per Local and State Codes.'

{¶ 7} " '1.02 SUMMARY'

{¶ 8} " 'A. Section includes the following: * * *'

{¶ 9} " 'Disconnecting, capping, or sealing, and removing site utilities to property line.'

{¶ 10} " '3.02 PREPARATION * * *'

{¶ 11} " 'B. Existing Utilities: Locate, identify, disconnect, and seal or cap off utilities serving buildings and structures to be demolished. * * *'

{¶ 12} " '3. Cut off pipe or conduit a minimum of 24 inches below grade. Cap, value, or plug and seal remaining portion of pipe or conduit after bypassing according to requirements of authorities having jurisdiction.'

{¶ 13} "See Exhibit B attached to Fanning's Motion for Summary Judgment. Fanning's construction drawings were to be used in the actual performance of the contract by South Central. Menzer Depo. at 29. Locations of the sewer lines (and other utilities) were part of a survey that was conducted in the preparation of the construction drawings. Menzer Depo. at 26. The survey was conducted by Defendant Wyco Consulting, Inc. (hereinafter 'Wyco'). Menzer Depo. at 25.

{¶ 14} "In January 2006, the demolition of the old high school began. On March 3, 2006, Trotwood employee Jerry Sever visited the demolition site and reminded South Central of the need to cap all sewer lateral lines. Hines Depo. at 52 & 60. Around March 12, 2006, Trotwood experienced substantial rain fall. At the same time, city residents living around Whispering Drive, near the area of the demolition, experienced high volumes of water in their basements. Flooding of this magnitude due to the sewer lines has never occurred on Whispering Drive. Hines Depo. at 20–21.

{¶ 15} "The City of Trotwood owns and operates the sewer system serving the community. In response to complaints from the property owners regarding flooding, Trotwood employees Dalton Hines and Jerry Sever responded to Whispering Drive to investigate. Hines and Sever opened the manholes on Whispering Drive and the surrounding areas. They found an unusually high volume of water on Whispering Drive. This unusually high volume continued southbound, and was eventually traced to the high school demolition site. When Hines and Sever inspected the manholes south of the demolition site, they discover[ed] these manholes contained a normal flow of water. At the demolition site, Hines saw a large depression in the ground with water pooling therein.

Hines Depo. at 16–25, 54, 67. After this incident, Trotwood conducted a camera inspection of the sewer lines around Whispering Drive. The inspection did not uncover any blockage, obstruction, or breach of the sewer lines. Id. at 41–42. Moreover, sewage backup typically involves clear liquids with solids and a strong odor. On March 12, 2006, the sewer system and basements on Whispering Drive were filled with large amounts of dark brown liquid. Brown liquid is an indicator of ground water, not sewage. Hines Depo. at 22, 77, 114.

{¶ 16} "On March 13, 2006, Thomas Odenigbo, the Public Works Director for the City of Trotwood, and representatives of TMCSD visited the demolition site. Odenigbo testified in his deposition that the excessive inflow of water in the sewer system occurred due to a hole created by the demolition site. Odenigbo Depo. at 94. According to Odenigbo, 'this hole had an opening, which was the lateral from the school, that got into a manhole, and this manhole connected to—a sanitary sewer [lateral] connected to the manhole [# 5].' Id. at 40. On the other hand, South Central Project Manager—Gary Jessie—testified that the open end of the lateral connected to manhole # 5 was not created until after the flooding. Jessie asserted this lateral was opened or cut during an exploratory dig conducted after the flood occurred. Jessie Depo. at 58, 59–60, and 64. In addition, Jamie Conn, part owner and supervisor for South Central, testified that he capped the lateral to manhole # 5 from inside the crawl space beneath the building. Conn Depo. at 92, 94, 99, and 203. Conn testified that he capped the lateral inside the crawl space until Gary Jessie could provide South Central clarification regarding utilities outside the building area. According to Conn, 'there was some discrepancy in what was on the drawings to what was on site. The drawings showed something different than what was actually out there on that site * * *. I wanted clarification from my construction manager.' Id. at 94, 204." September 2, 2009 decision.[3]

{¶ 17} On July 28, 2006, the city of Trotwood and TMCSD filed a declaratory-judgment action against South Central and a number of Trotwood residents who had been affected by the flooding. The city of Trotwood and TMCSD sought a determination of their liability, if any, to the affected residents. The complaint also included various tort and contract claims against South Central. The city of Trotwood and TMCSD later filed an amended complaint, adding claims against additional construction defendants including the Skillman Corporation, Megen Construction Company, Fanning/Howey Associates, Inc., Wyco Consulting, Inc., and more Trotwood residents. Thereafter, the residents asserted counterclaims against the city of Trotwood and TMCSD as well as cross-claims against the

---

3. Additional facts will be discussed below as they are relevant to a particular assignment of error.

construction defendants. Other residents intervened in the action and asserted claims as well.

{¶ 18} On September 2, 2009, the trial court entered summary judgment in favor of the city of Trotwood and TMCSD on all of the residents' counterclaims against them. Specifically, the trial court found the city and the school district entitled to political-subdivision immunity under R.C. Chapter 2744. That same day, the trial court filed another entry granting summary judgment to Wyco on the residents' cross-claim against it. The trial court filed a third entry on September 2, 2009, overruling a motion by the residents to amend their answer and to add various counterclaims, cross-claims, and third-party claims. Thereafter, on September 16, 2009, the trial court entered a declaratory judgment finding that the city and TMCSD were not liable for any losses related to the flooding based on political-subdivision immunity. The trial court's declaratory judgment contained Civ.R. 54(B) certification. Finally, on November 6, 2009, the trial court added Civ.R. 54(B) certification to its earlier ruling granting summary judgment to Wyco. The residents timely appealed from (1) the trial court's declaratory judgment in favor of the city and TMCSD and (2) the trial court's entry of summary judgment in favor of Wyco. We consolidated the two appeals on February 11, 2010.

{¶ 19} In their first assignment of error, the residents contend that the trial court erred in granting summary judgment to the city of Trotwood on their counterclaims.[4] Applying the three-tiered immunity test set forth in R.C. Chapter 2744, the residents claim that the city is liable to them for the negligent performance of a proprietary function. The residents maintain that the city negligently performed a proprietary function in two ways. First, it negligently failed to conduct a proper inspection of the capped utilities at the demolition site. Second, it negligently maintained the sewer line running through the old high school property at the demolition site.

{¶ 20} We review summary judgment de novo, which means that "we apply the standards used by the trial court." *Brinkman v. Doughty* (2000), 140 Ohio App.3d 494, 497, 748 N.E.2d 116. Summary judgment is appropriate when a trial

---

4. Although the residents' appellate brief challenges the trial court's entry of summary judgment in favor of the city and TMCSD on the residents' counterclaims, the residents did not appeal from that summary-judgment ruling, which the trial court filed on September 2, 2009. Instead, they appealed from the trial court's subsequent September 16, 2009 ruling in which it entered a judgment in favor of the city and TMCSD on the political subdivisions' complaint for declaratory relief. We note, however, that the trial court's declaratory judgment merely incorporated by reference the analysis contained in its earlier summary judgment on the residents' counterclaims. For present purposes, we will treat the appeal as being from the trial court's entry of summary judgment against the residents on their counterclaims, particularly since neither the city nor TMCSD has objected to the issues raised in the residents' appellate brief.

court finds "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46.

{¶ 21} We begin our analysis with a review of R.C. Chapter 2744. "The Political Subdivision Tort Liability Act, contained in that chapter, prescribes a three-tier analysis to determine whether a political subdivision is immune from liability. The beginning point of the analysis is the general rule that a political subdivision is not liable in damages for loss to property allegedly caused by an act of the subdivision or one of its employees in connection with a governmental or proprietary function. The second tier of the analysis asks whether an exception to that general rule should apply, i.e., whether one of the exceptions contained in R.C. 2744.02(B)(1)–(5) applies. And, if a political subdivision loses immunity under the second tier, the third tier of the analysis asks whether a political subdivision can restore immunity by showing that one of the defenses contained in R.C. 2744.03 applies." (Citations omitted.) *Peshek v. Springfield,* Clark App. No. 2008 CA 72, 2009-Ohio-3951, 2009 WL 2436804, ¶ 20; see also *Ezerski v. Mendenhall,* 188 Ohio App.3d 126, 2010-Ohio-1904, 934 N.E.2d 951, ¶ 5.

{¶ 22} In the present case, the residents do not dispute that the city qualifies as a political subdivision for purposes of establishing immunity under R.C. 2744.02(A)(1). As set forth above, however, they argue that the city's general immunity is abrogated by R.C. 2744.02(B)(2), which renders a political subdivision liable "for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions." According to the residents, city employees negligently provided inspection services and negligently maintained the sewer system. The residents assert that both activities are proprietary functions, thereby subjecting the city to liability.

{¶ 23} With regard to the negligent-inspection argument, R.C. 2744.01(C)(2)(p) provides that a governmental function includes "[t]he provision or nonprovision of inspection services of all types, including, but not limited to, inspections in connection with building, zoning, sanitation, fire, plumbing, and electrical codes, and the taking of actions in connection with those types of codes, including, but not limited to, the approval of plans for the construction of buildings or structures and the issuance or revocation of building permits or stop work orders in connection with buildings or structures."

{¶ 24} The residents concede that the decision whether to provide inspection services qualifies as a governmental function under R.C. 2744.01(C)(2)(p). They argue, however, that "the negligent failure to conduct a reasonable inspec-

tion" is a proprietary function. In other words, the residents assert that, having made the decision to conduct an inspection, the city's act of carrying out the inspection was a proprietary function, the negligent performance of which subjected it to tort liability. We find this argument to be unpersuasive.

{¶ 25} As set forth above, the statute states that "the provision" of inspection services of all types is a governmental function. By its own terms, R.C. 2744.01(C)(2)(p) is not limited to the threshold decision regarding whether or not to provide inspections. Ohio courts also have not read R.C. 2744.01(C)(2)(p) as the residents do. See, e.g., *Klein v. Sloger* (May 24, 1991), Columbiana App. No. 90–C–19, 1991 WL 95265, *2 (finding, based in part on R.C. 2744.01(C)(2)(p), that "[t]he inspection of the water and sewage systems by appellees was a governmental function"); *Gates–Hewlett v. Cleveland* (Aug. 23, 2001), Cuyahoga App. No. 78863, 2001 WL 957653, *4, citing *Butler v. Jordan* (Aug. 12, 1999), Cuyahoga App. No. 74509, 1999 WL 608812 ("In the specific area of inspections, as in the case at bar, this court has determined that a plain reading of 2744.01(C)(2) indicates that the legislature intended for all inspections conducted by the city to be considered a governmental function"). Assuming, arguendo, that the city had a duty to inspect the allegedly faulty sewer-pipe cap, we agree with the trial court that its performance of that obligation was a governmental function to which immunity applies. Therefore, even if the city acted negligently by merely reminding a contractor to cap the sewer pipe, as the residents allege, that negligence did not remove the immunity provided by R.C. 2744.02(A)(1).[5]

{¶ 26} We are equally unpersuaded by the residents' argument that the city may be held liable for negligently maintaining its sewer system. We do not dispute that the maintenance of a public sewer system is a proprietary function. *Ezerski*, 188 Ohio App.3d 126, 2010-Ohio-1904, 934 N.E.2d 951, at ¶ 8; R.C. 2744.01(G)(2)(d). We are unconvinced, however, that the present case involves a maintenance issue. Construed most favorably to the residents, the record indicates that a contractor negligently capped a lateral sewer line running from the old high school to the city's main sewer line. The city knew nothing about the issue until after a heavy rain caused water to run through the improperly capped lateral and overloaded the city's main sewer line, resulting in the flooding at issue. Upon being informed of the problem, the city located the source of the

---

5. Parenthetically, we note also that the present case appears to involve a noninspection rather than a negligent inspection. On appeal, the residents suggest that the city negligently "inspected" the sewer lines by reminding contractor Jamie Conn to cap them. But speaking to a contractor does not constitute conducting an inspection at all. Thus, instead of being viewed as a negligent-inspection case, the present case could be viewed as one involving the "nonprovision of inspection services," which still is defined as a governmental function under R.C. 2744.01(C)(2)(p).

flooding and stopped it. A subsequent camera inspection of the pertinent sewer lines showed no blockage or disrepair.

{¶ 27} The residents contend that "the evidence shows that the sewer system failed—by backing up—because it was negligently maintained, through the combination of South Central's failure to cap a lateral and the City's failure to inspect the line to be sure it had been properly capped." We addressed the inspection issue above, concluding that the city's provision or nonprovision of inspection services was a governmental function to which immunity attached. As for South Central's failure to cap the lateral in question, the city cannot be held liable for this shortcoming.

{¶ 28} Although the improperly capped line was a lateral rather than a main, the residents assert that the city had a duty to maintain it because it was put to public use. See, e.g., *Doud v. Cincinnati* (1949), 152 Ohio St. 132, 39 O.O. 441, 87 N.E.2d 243. Moreover, the residents contend that the city's duty to maintain the lateral line was nondelegable. We disagree with the latter contention. It is well settled that a principal generally is not responsible for the negligence of an independent contractor over whom it retained no right to control the manner or mode of doing the contracted-for work. *Clark v. Southview Hosp. & Family Health Ctr.* (1994), 68 Ohio St.3d 435, 438, 628 N.E.2d 46. In the present case, the city was not even a party to the contract, which was between South Central and TMCSD, and did not have any control over the work performed.

{¶ 29} The general rule that a principal is not responsible for the negligence of an independent contractor is embodied in R.C. 2744.01(B), which expressly provides that for purposes of tort immunity, "employee" of a political subdivision does not include an independent contractor. "Thus, the exception to immunity set forth in R.C. 2744.02(B)(2) does not apply where the conduct for which liability is sought to be imposed was performed by an independent contractor of the political subdivision, and where there is no evidence that the political subdivision exercised control over the independent contractor's actions." *Weldon v. Prairie Twp.*, Franklin App. No. 10AP–311, 2010-Ohio-5562, 2010 WL 4632553, ¶ 13.

{¶ 30} The residents nevertheless invoke an exception to the general rule of a principal's nonliability for an independent contractor's work. In particular, they rely on the "nondelegable duty" doctrine. Under this doctrine, "the employer may delegate the *work* to an independent contractor, but he cannot delegate the *duty*. In other words, the employer is not insulated from liability if the independent contractor's negligence results in a breach of the duty." *Pusey v. Bator* (2002), 94 Ohio St.3d 275, 279, 762 N.E.2d 968. "Employers are held

liable under the traditional nondelegable duty exception because the nature of the work contracted involves the need for some specific precaution, such as a railing around an excavation in a sidewalk, or the work involved is inherently dangerous, such as blasting." *Albain v. Flower Hosp.* (1990), 50 Ohio St.3d 251, 262, 553 N.E.2d 1038, overruled in part on other grounds by *Clark.* "Liability is premised on the peculiar risks and special precautions attendant to the work itself." Id. at 261.

{¶ 31} " 'It is obvious that an employer of an independent contractor may always anticipate that if the contractor is in any way negligent toward third persons, some harm to such persons may result. Thus one who hires a trucker to transport his goods must, as a reasonable man, always realize that if the truck is driven at an excessive speed, or with defective brakes, some collision or other harm to persons on the highway is likely to occur.' " Id. at 261, 553 N.E.2d 1038, fn. 9, quoting 2 Restatement of the Law 2d, Torts (1965), Section 413, comment b. The nondelegable-duty doctrine " 'has no reference to such a general anticipation of the possibility that the contractor may in some way be negligent. It is not concerned with the taking of routine precautions, of a kind which any careful contractor could reasonably be expected to take, against all of the ordinary and customary dangers which may arise in the course of the contemplated work. Such precautions are the responsibility of the contractor; and if the employer has exercised reasonable care to employ a contractor who is competent and careful * * *, he is not required to provide, in the contract or otherwise, that the contractor shall take them.' " Id.

{¶ 32} On the other hand, when the work being performed is inherently dangerous, "the employer hiring the independent contractor has a duty to see that the work is done with reasonable care and cannot, by hiring an independent contractor, insulate himself or herself from liability for injuries resulting to others from the negligence of the independent contractor or its employees." *Pusey,* 94 Ohio St.3d at 279–280. "To fall within the inherently-dangerous-work exception, it is not necessary that the work be such that it cannot be done without a risk of harm to others, or even that it be such that it involves a high risk of such harm. It is sufficient that the work involves a risk, recognizable in advance, of physical harm to others, which is inherent in the work itself." Id. at 280, 762 N.E.2d 968. "Ohio courts have generally treated the issue of whether employment is inherently dangerous as a question of law to be determined by the court." *Tipton v. Bernie's Elec. Sales & Serv., Inc.,* Williams App. No. WM–03–021, 2004-Ohio-5249, 2004 WL 2334314, ¶ 33.

{¶ 33} Broadly speaking, the Ohio Supreme Court has recognized that "[a] construction site is inherently a dangerous setting." *Bond v. Howard Corp.* (1995), 72 Ohio St.3d 332, 336, 650 N.E.2d 416. Similarly, we have observed that

"[e]ngaging in a construction job is an inherently dangerous job * * *." *Reno v. Concrete Coring, Inc.*, Montgomery App. No. 20650, 2005-Ohio-3062, 2005 WL 1415041, ¶ 16. It does not follow, however, that *every* activity occurring at a construction (or demolition) site is inherently dangerous. We are unpersuaded that an ordinary activity necessarily is transformed into an inherently dangerous one merely because it happens to take place at a construction or demolition site.

{¶ 34} In *Amurri v. Columbus* (Feb. 28, 1985), Franklin App. No. 84AP–597, a case cited by the residents, the Tenth District concluded that the demolition of a building constitutes an inherently dangerous activity. In that case, however, the activity at issue involved the actual demolition of a wall, which collapsed onto a nearby structure. In finding the demolition to be inherently dangerous, the Tenth District cited *Covington & Cincinnati Bridge Co. v. Steinbrock* (1899), 61 Ohio St. 215, 55 N.E. 618, which also involved damage caused by tearing down a wall. Although the act of razing a building is inherently dangerous, we are unpersuaded that capping a sewer pipe, the activity at issue here, likewise is inherently dangerous. Cf. *Weldon*, 2010-Ohio-5562, 2010 WL 4632553, at ¶ 15 (distinguishing *Amurri* and rejecting an argument that "the repair of the sewer line in this case, even assuming that the township was under a duty to complete the repairs, was such an inherently dangerous activity that the township could not avoid liability by delegating that duty to an independent contractor"); see also *Becker v. Kreilein* (Ind.2002), 770 N.E.2d 315, 318 (determining that capping a sewer pipe clearly is not "intrinsically dangerous work" and holding that a principal was not liable for negligent capping performed by an independent contractor); *Hernandez v. Midwest Gas Co.* (Iowa App.1994), 523 N.W.2d 300, 305 ("Under the facts of this case, cutting and capping a live gas line does not rise to the level of a peculiar risk or an inherent danger. In this case, the risk did not come from the nature of cutting and capping; rather, it arose from the manner in which the work was done"). We agree with the Indiana Supreme Court's determination in *Becker* that there is nothing inherently dangerous about capping a sewer pipe, which requires severing the pipe and filling the end with concrete or grout.

{¶ 35} We are equally unpersuaded by the residents' reliance on a treatise to support their claim that the city breached a nondelegable duty. The residents cite 18A McQuillin, *Municipal Corporations*, Section 53.125, for the proposition that a municipality has a nondelegable duty to maintain its sewer lines. As set forth above, we are unpersuaded that the present case involves a maintenance issue. But even if it did, the cited portion of McQuillin's treatise cites no Ohio case law. Instead, it relies on a handful of older cases from other jurisdictions, some of which, in circular fashion, cite nothing but McQuillin's treatise and none of which resolves the issue before us.

{¶ 36} The residents also rely on *Pusey* and *Amurri* to support their nondelegable-duty argument. In *Pusey,* the Ohio Supreme Court stated: "Nondelegable duties arise in various situations that generally fall into two categories: (1) affirmative duties that are imposed on the employer by statute, contract, franchise, charter, or common law and (2) duties imposed on the employer that arise out of the work itself because its performance creates dangers to others, i.e., inherently dangerous work." *Pusey,* 94 Ohio St.3d at 279, 762 N.E.2d 968, citing Prosser & Keeton, The Law of Torts (5th Ed.1984) 511–512, Section 71, and *Albain,* 50 Ohio St.3d at 260–261, 553 N.E.2d 1038.

{¶ 37} We fully addressed the inherently-dangerous-work issue above. To the extent that the residents might suggest that a nondelegable duty exists because the city is obligated by "statute, contract, franchise, charter, or common law" to maintain its sewer system, we are unpersuaded. In *Pusey,* the Ohio Supreme Court recognized that nondelegable duties arise from the foregoing sources. This does not mean, however, that all duties imposed by "statute, contract, franchise, charter, or common law" necessarily are nondelegable. If that were so, then no duties ever would be delegable because we are aware of no other sources from which a duty can arise. A review of Prosser and Keeton's work makes clear that a duty must be created by "statute, contract, franchise, charter, or common law" *and* one of those sources must make the nondelegable nature of the duty apparent to the court. See Prosser & Keeton, The Law of Torts, at 511–512 (a nondelegable duty "may be imposed by statute, by contract, by franchise or charter, or by the common law. * * * It is difficult to suggest any criterion by which the non-delegable character of such duties may be determined, other than the conclusion of the courts that the responsibility is so important to the community that the employer should not be permitted to transfer it to another").

{¶ 38} Even if we accept that the city has a duty to maintain its sewer system and that the present case involves a sewer-maintenance issue, the residents have failed to persuade us that responsibility for capping the lateral line could not be delegated to South Central. In support of their argument, the residents cite *Amurri,* Franklin App. No. 84AP–597. In that case, the Tenth District held that the city of Columbus could be held liable for the negligent demolition activities of an independent contractor. We find the residents' reliance on *Amurri* to be unconvincing for at least two reasons. First, the Tenth District held that Columbus could be held liable because the actual demolition of the building at issue was an inherently dangerous activity. Conversely, the act of capping a sewer pipe is not inherently dangerous. Second, *Amurri* was decided prior to the enactment of R.C. Chapter 2744, which grants broad statutory immunity to political subdivisions and their employees. The immunity provided

by R.C. Chapter 2744 is subject to certain enumerated exceptions. *Glover v. Dayton Pub. Schools* (Aug. 13, 1999), Montgomery App. No. 17601, 1999 WL 958492. One of those exceptions, found in R.C. 2744.02(B)(2), provides that a political subdivision can be held liable for certain negligent acts of its employees. Another section, R.C. 2744.01(B), precludes political subdivisions from being held liable for the negligence of independent contractors. Nothing in R.C. Chapter 2744 creates an exception when an independent contractor performs a nondelegable duty.[6] Therefore, we would find the nondelegable-duty doctrine inapplicable in this case even if capping the sewer line were inherently dangerous.

{¶ 39} Finally, we reject the residents' argument that the city waived its ability to assert statutory immunity. The residents claim that the city waived "any immunity to which it might have been entitled" in three ways. First, the residents cite R.C. 2744.03(A)(6)(b) and argue that the city acted "willfully, wantonly, and recklessly by failing to take any action to insure that the utilities on the demolition site had been properly capped." Second, the residents contend that the city waived immunity by initiating a declaratory-judgment action against them. Third, the residents assert that the city waived immunity "by publicly and privately assuring [them] that it would take care of their problem."

{¶ 40} Upon review, we find the residents' waiver arguments to be unpersuasive. Preliminarily, we note that the residents first addressed the waiver issue in their reply brief. It is well settled that a party cannot "use a reply brief to raise new issues." *Ostendorf v. Montgomery Cty. Bd. of Commrs.*, Montgomery App. Nos. 20257 and 20261, 2004-Ohio-4520, 2004 WL 1908770, ¶ 29. In any event, we find the waiver arguments unpersuasive on their merits. While R.C. 2744.03(A)(6)(b) provides that willful, wanton, or reckless misconduct abrogates immunity for an employee of a political subdivision, the record does not portray any such misconduct by a city employee.

{¶ 41} Nor are we persuaded that the city waived its immunity by commencing a declaratory-judgment action. The general rule of immunity, set forth in R.C. 2744.02(A)(1), states: "Except as provided in division (B) of this section, *a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property* allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." (Emphasis added.)

---

**6.** R.C. 2744.02(B)(5) does create an exception to immunity when civil liability expressly is imposed on a political subdivision by another statute. That exception does not apply, however, merely because a statute expressly imposes a *duty*. Immunity continues to exist unless a statute expressly imposes *liability* as well. *Butler v. Jordan* (2001), 92 Ohio St.3d 354, 357, 750 N.E.2d 554. The residents have not identified any statute expressly imposing liability on the city.

The foregoing rule does not preclude a political subdivision from asserting statutory immunity when it files a declaratory-judgment action and the defendants respond by filing counterclaims against the political subdivision for money damages. The statute provides that a political subdivision is not liable for damages "in a civil action" without regard to which party filed the initial pleading. The present case is a civil action, and the residents filed counterclaims against the city for loss of property. The residents cite no case law to support their argument that immunity does not exist because their causes of action arose as counterclaims.

{¶ 42} The residents apparently rely on R.C. 2744.03, which involves the third tier of the immunity analysis and, under certain circumstances, reinstates immunity that otherwise would be lost under R.C. 2744.02.[7] It provides several defenses to reestablish immunity in "a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function." R.C. 2744.03(A).

{¶ 43} In the present case, we need not decide whether the defenses provided by R.C. 2744.03 are limited in their application to "a civil action brought against a political subdivision" or whether they also apply to counterclaims filed against a political subdivision in a civil action commenced by the political subdivision itself. We need not reach this issue because the residents have failed to establish that the city ever lost its immunity under R.C. 2744.02. Therefore, we have no occasion to reach the third tier of the immunity analysis.

{¶ 44} Finally, we are unpersuaded by the residents' argument that the city waived immunity assuring them that it would "take care of their problem." Assuming arguendo that the city failed to fulfill this ambiguous promise, the residents do not even attempt to explain how this would result in a loss of immunity under R.C. Chapter 2744. For the foregoing reasons, we conclude that the trial court properly entered summary judgment in favor of the city.[8] Accordingly, the first assignment of error is overruled.

---

7. The residents cite R.C. 2744.01(A) for the proposition that immunity applies "in a civil action brought against a political subdivision or employee of a political subdivision." A review of R.C. 2744.01(A) reveals that it says no such thing. It defines the phrase "emergency call" to mean "a call to duty, including, but not limited to, communications from citizens, police dispatches, and personal observations by peace officers of inherently dangerous situations that demand an immediate response on the part of a peace officer." As explained above, we presume that the residents intended to cite R.C. 2744.03, which contains more relevant language.

8. Having found the city entitled to summary judgment for the reasons set forth above, we need not address the residents' argument about whether demolishing a school building is a

{¶ 45} In their second assignment of error, the residents claim that the trial court erred in granting summary judgment to TMCSD. Having reviewed this assignment of error, we note that it involves exactly the same issues regarding inherently dangerous activities and the nondelegable-duty doctrine that we resolved above with regard to the city. Based on the reasoning set forth in our analysis of the first assignment of error, we conclude that capping the sewer line and maintaining the sewer system were not inherently dangerous activities. Nor did those activities implicate a nondelegable duty on the part of TMCSD. Finally, the record reflects that TMCSD did not retain any right to control the manner or means of the work performed by the independent contractor in this case. Accordingly, the second assignment of error is overruled.

{¶ 46} In their third assignment of error, the residents assert that the trial court erred in granting summary judgment to Wyco. They argue that Wyco breached a duty by omitting certain sewer lines from a site survey it completed for Fanning–Howey, the architect of the school-demolition project. The residents further assert that Wyco's breach of its duty led Fanning–Howey to produce inaccurate demolition plans, which in turn caused the general contractor, South Central, to improperly cap the sewer lateral within the footprint of the school building, which then led to the flooding at issue. The residents insist that any negligence by Fanning–Howey in using the inaccurate site survey, or by South Central employee Jamie Conn in capping the sewer lateral inside the building's footprint, did not absolve Wyco of liability.

{¶ 47} The trial court held otherwise, finding "no evidence * * * that Wyco failed to perform its work according to the standards of the surveying community." In support, the trial court cited evidence establishing that the survey with the missing sewer lines was a preliminary site survey. The trial court noted that Wyco subsequently produced a final site survey that included all sewer lines and manholes. Furthermore, the trial court cited testimony from Fanning–Howey representative Darrell Menzer, who admitted knowing that the first survey was only preliminary.

{¶ 48} On appeal, the residents contend that the trial court erred in finding Wyco entitled to summary judgment simply because its final survey was accurate. As set forth above, the residents contend that Fanning–Howey's use of the wrong version of Wyco's site survey to complete its architectural drawings and South Central's alleged negligence in capping the sewer lateral at issue do not excuse Wyco's failure to include all sewer lines on its preliminary site survey.

---

governmental or proprietary function. Because none of the exceptions to immunity apply, we also have no occasion to consider whether any of the R.C. 2744.03 defenses to the exceptions apply.

{¶ 49} We disagree. Implicit in the residents' argument is the proposition that Wyco had *a duty* to depict all sewer lines on its preliminary survey. They cite no evidence or case law to support this proposition, however, and the record indicates otherwise. Attached to Wyco's summary-judgment motion was an affidavit from its owner, Ruth Campbell. She averred that in her professional opinion as a licensed engineer and surveyor, the work Wyco performed in this case "complied with the standard of care applicable to engineers." The work to which Campbell referred consisted of supplying Fanning–Howey with two site surveys, a preliminary one and a final one. Wyco initially gave Fanning–Howey a preliminary electronic copy of the survey that lacked certain sewer lines. Thereafter, Wyco provided Fanning–Howey with a final version of the site survey. The final version accurately showed all sewer lines and manholes. Fanning–Howey representative Darrell Menzer admitted that he was aware that the first version of the survey was only preliminary. He explained that a Fanning–Howey CAD operator had inadvertently used the preliminary survey rather than the final one to produce the architectural drawings upon which the general contractor later relied. Menzer acknowledged that it was not customary within the architectural industry for a CAD operator to prepare architectural drawings by relying on a preliminary site survey rather than a final one.

{¶ 50} Based on the uncontroverted evidence set forth above, the trial court did not err in finding no negligence by Wyco as a matter of law. Although the residents claim that Wyco negligently omitted certain sewer lines from its preliminary survey, they cite no evidence to support this claim. Instead, they maintain that they do not need expert testimony, or apparently any other evidence, to establish the applicable standard of care and a corresponding breach when a professional's lack of skill or care is so apparent as to be within the comprehension of a layperson.

{¶ 51} In our view, however, it is not a matter of common knowledge that Wyco's omission of certain sewer lines from its preliminary site survey, as opposed to its final survey, constituted a violation of the applicable standard of care. The most relevant testimony on this issue was provided by Menzer, who admitted that industry custom required Fanning–Howey to rely on Wyco's final site survey, not the preliminary one. This testimony, combined with Ruth Campbell's averment that Wyco's work "complied with the standard of care applicable to engineers," compelled the residents to come forward with some evidence to the contrary. In light of their failure to do so, the trial court properly entered summary judgment in favor of Wyco.[9] Accordingly, the third assignment of error is overruled.

---

9. Having found summary judgment proper for the reason relied on by the trial court, we need not address Wyco's alternative arguments for summary judgment in its favor.

{¶ 52} In their fourth assignment of error, the residents allege that the trial court erred in overruling their motion for leave to file an amended answer, counterclaim, cross-claim, and third-party claims.

{¶ 53} The unsuccessful motion had sought "to add sixteen new parties * * * and assert numerous new claims against the city of Trotwood, the Trotwood–Madison School District, and numerous other defendants." The trial court concluded that the motion was unduly prejudicial due to the timing of its filing and the advanced state of discovery. The trial court also found no prima facie showing to support the new claims alleged. Finally, the trial court determined that not all of the amended claims would relate back to the residents' initial filing.

{¶ 54} Upon review, the city of Trotwood and TMCSD have persuaded us that the trial court's entry denying the residents' motion for leave to amend is not a final, appealable order. Absent Civ.R. 54(B) certification, a trial court's order denying a motion for leave to amend is not appealable when other claims remain pending in the case. See, e.g. *Shimko v. Lobe,* Franklin App. No. 01AP–1113, 2002-Ohio-2015, 2002 WL 723797; see also *Worthington v. Wells Fargo Bank Minnesota, N.A.,* Richland App. No. 10 CA 40, 2010-Ohio-4541, 2010 WL 3722628, ¶ 31, quoting *Germ v. Fuerst,* Lake App. No. 2003–L–116, 2003-Ohio-6241, 2003 WL 22764564, ¶ 7 (" '[t]he denial of a motion to amend a complaint to include a new cause of action is analogous to the dismissal of a claim after it has been filed. Unless the judgment contains Civ.R. 54(B) language, it is not a final appealable order' "); *River Oaks v. Krann,* Lake App. No. 2008–L–166, 2009-Ohio-5208, 2009 WL 3154460, ¶ 35–36.[10]

{¶ 55} The residents do not dispute that the trial court's ruling initially was interlocutory. They contend that it became final and appealable, however, once the trial court included Civ.R. 54(B) certification on its subsequent entry of a declaratory judgment in favor of the city and TMCSD.[11] The residents argue that the existence of this appealable order resolved all claims by and against the city and TMCSD and made the previously interlocutory ruling regarding amendment of the pleadings final as well.

---

**10.** On at least one occasion, this court has determined that an order denying leave to amend a pleading is not immediately appealable even when it does contain Civ.R. 54(B) certification. *Doe v. Great Am. Ins. Co.* (Nov. 20, 1984), Montgomery App. No. CA 8647, 1984 WL 4116. For present purposes, however, it is enough for us to find that the lack of Civ.R. 54(B) certification made the trial court's ruling on the residents' motion for leave to amend nonappealable.

**11.** The residents actually argue that the trial court's summary-judgment ruling in favor of the city and TMCSD contained Civ.R. 54(B) certification. As set forth above, it did not. Only the trial court's subsequent entry of declaratory judgment in favor of the city and TMCSD contained Civ.R. 54(B) certification.

{¶ 56} In support of their argument, the residents cite *Horner v. Toledo Hosp.* (1993), 94 Ohio App.3d 282, 640 N.E.2d 857, and *Beatley v. Knisley,* 183 Ohio App.3d 356, 2009-Ohio-2229, 917 N.E.2d 280. These cases recite the well-settled principle that interlocutory orders are merged into a final judgment and that an appeal from a final judgment includes all interlocutory orders merged into it. In both cases, however, the final judgment at issue terminated the entire case, i.e., all claims involving all parties. Unlike *Horner* and *Beatley,* the trial court's entry of a declaratory judgment (and summary judgment) in favor of the city and TMCSD did not dispose of all claims involving all parties. To the contrary, cross-claims and/or third-party claims involving certain construction defendants remained pending. The trial court's entry of a declaratory judgment in favor of the city and TMCSD was final and appealable only because the trial court included Civ.R. 54(B) certification with it.

{¶ 57} The issue before us, then, is whether a trial court's inclusion of Civ.R. 54(B) certification on one otherwise interlocutory order (the declaratory-judgment ruling) makes another otherwise interlocutory order (the ruling on the residents' motion for leave to amend) final and appealable. Although neither party has cited a case on point, we conclude that it does not. "[A]n order that neither disposes of all claims between the parties nor contains an express determination that there is no just reason for delay is an interlocutory order. * * * When an order of a trial court is interlocutory, the order remains subject to revision or modification by the trial court until and unless the order is certified as suitable for appeal, or the action is finally terminated as to all claims and all parties. Once a final judgment is issued terminating a case, all interlocutory orders are merged into the final judgment." (Citations omitted.) *Lingo v. Ohio Cent. RR. v. Norfolk S. Ry.,* Franklin App. No. 05–AP–206, 2006-Ohio-2268, 2006 WL 1230679, ¶ 17.

{¶ 58} In the present case, the trial court's denial of the residents' leave to amend did not resolve all claims. Nor did it contain Civ.R. 54(B) certification. Therefore, it was interlocutory. It would remain so unless the trial court certified it for appeal or terminated the action as to all claims and all parties. Neither of these events occurred. Because the trial court neither affixed Civ.R. 54(B) certification to its ruling on the motion for leave to amend nor entered final judgment as to all claims and parties, the ruling on the motion for leave to amend remained interlocutory. Cf. *Kennedy v. Wiley* (Sept. 10, 1998), Franklin App. No. 97APE12–1569, 1998 WL 598105, *3 ("The order of the trial court denying leave to amend to include State Farm as a party defendant did not contain 'no just reason for delay' language, and was not subsumed into the later order making the grant of summary judgment in favor of Heritage a final appealable order. Appellants' third assignment of error is therefore overruled for lack of a

final appealable order"); *Cononi v. Mikhail* (Jan. 10, 1984), Montgomery App. No. 8161, 1984 WL 5419 ("We now recognize that the trial court order denying appellant's motion to amend, and the order granting summary judgment in Heritage Realtors favor are two separate and distinct judgments. The former lacks a Rule 54(B) no just reason for delay determination by the trial court. Consequently, it was not a final appealable order. * * * As the denial on plaintiffs['] motion to amend is subject to revision by the trial court at any time before the entry of judgment against the existing defendant, Gateway Roofing, this is not a final appealable order. We therefore lack jurisdiction to address the merits of the claim at this time").

{¶ 59} In reaching our conclusion, we note, too, that the residents' motion for leave to amend did not pertain to just the city and TMCSD. In their reply brief, the residents suggest that the trial court's denial of their leave to amend should merge into its summary judgment and declaratory judgment in favor of the city and TMCSD because no claims remain pending against either of those entities. We note, however, that the motion for leave to amend also sought to add claims against other defendants who still have claims pending against them. As to those defendants, the ruling on the residents' motion for leave to amend undoubtedly remains interlocutory because no appealable judgment has been rendered for or against them. For the foregoing reasons, we conclude that the trial court's ruling on the motion for leave to amend is interlocutory and unappealable at this time. The fourth assignment of error is overruled.

{¶ 60} The judgment of the Montgomery County Common Pleas Court is affirmed.

Judgment affirmed.

GRADY, P.J., concurs.

FAIN, Judge, concurring.

{¶ 61} Although I concur in Judge Brogan's opinion for this court in all other respects, I do not construe *Ostendorf v. Montgomery Cty. Bd. of Commrs.*, Montgomery App. Nos. 20257 and 20261, 2004-Ohio-4520, 2004 WL 1908770, quite so broadly. In that opinion, we declined to entertain an additional assignment of error that was asserted, for the first time, in a reply brief.

{¶ 62} In general, if an appellant argues a proposition of law—here, that the governmental entities were not entitled to summary judgment because they did not enjoy sovereign immunity with respect to the actions giving rise to liability— and the governmental entities respond by arguing the contrary proposition of law—here, that they did enjoy sovereign immunity from liability—I would find it an appropriate use of a reply brief to reply to the appellees' answering argument

by an argument of avoidance— here, that the governmental entities had waived any sovereign immunity that they might otherwise arguably have had.

{¶ 63} Because I agree that the governmental entities did not waive their immunity, I concur in the overruling of the first two assignments of error. I also concur in the overruling of the third assignment of error, for all of the reasons set forth in Judge Brogan's opinion. Therefore, I concur in the judgment of affirmance.